FILED
United States Court of Appeals
Tenth Circuit

July 15, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RICHARD CAMPFIELD, individual,
d/b/a ULTRA BOND LICENSING,
d/b/a ULTRA BOND WINDSHIELD
REPAIR AND REPLACEMENT;
ULTRA BOND, INC., a California
corporation authorized to do business
in Colorado,

      Plaintiff-Appellants and Cross-
      Appellees,

v.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY, an Illinois corporation;
LYNX SERVICES, L.L.C., formerly
known as LYNX SERVICES FROM
PPG. L.L.C., a Kansas limited liability
company,

      Defendant-Appellees and Cross-
      Appellants.

Nos. 06-1442, 06-1467, and 06-1469

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 03-CV-00306-REB-BNB)**

---

Todd L. Vriesman, Montgomery, Kolodny, Amatuzio & Dusbabek, LLP, Denver,
Colorado (Robert L. Allman and John P. Mitzner, Allman & Mitzner, LLC,
Denver, Colorado, with him on the briefs) for Plaintiff-Appellants.

Michael S. McCarthy, Faegre & Benson, LLP, Denver, Colorado (John D. Shively, Heather Carson Perkins, Nadia G. Malik, Faegre & Benson, LLP, Denver, Colorado, with him on the briefs) for Defendant-Appellee State Farm Mutual Automobile Insurance Company.

Richard F. Paciaroni, Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Pittsburgh, Pennsylvania (Gary Parish, Sander Ingebretson & Parish, Denver, Colorado and Jason L. Richey, Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Pittsburgh, Pennsylvania, with him on the briefs) for Defendant-Appellee Lynx Services, LLC.

Before **MURPHY**, **SEYMOUR** and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

Richard Campfield is both an owner of an auto-glass repair shop and the holder of fourteen patents for processes to repair or prevent windshield cracks. He believes, contrary to industry practice, that it is feasible—indeed, safer—to repair many windshield cracks between six and eighteen inches long rather than to replace the windshield. In 2003, apparently exasperated with his lack of success in persuading auto insurance companies to change their auto-glass repair policies, Mr. Campfield brought suit against State Farm Insurance Company and its agent, Lynx Services, Inc., challenging State Farm's policy of recommending that insureds replace windshields damaged by longer-than-six-inch cracks. He brought claims against State Farm and Lynx for violations of the Sherman Act, violations of the Colorado Consumer Protection Act (CCPA), and tortious

-2-

interference with actual and prospective contractual relations. His suit was dismissed by the district court, and we affirm, finding that Mr. Campfield failed to properly plead his antitrust claims and failed to provide sufficient evidence of a wrongful act by State Farm for purposes of the CCPA or tortious interference.

## I. Background

With over 40 million policy holders, State Farm Insurance Company is one of the largest automobile insurers in the United States. Each year, State Farm insureds make approximately 1.7 million claims for glass-only damage—damage limited to a car's glass such as a broken headlight or a windshield crack. Prior to 1997, State Farm handled glass-only claims through local personnel, resulting in regional variation in the handling of glass claims. To lower administrative costs, State Farm developed a nationwide program for handling glass-only claims. One aspect of this change was the State Farm Offer and Acceptance Program ("Program") by which State Farm contracted with glass shops to provide services in accordance with State Farm policy and pursuant to a fixed reimbursement schedule. As part of the Program, State Farm reimbursed long crack repair at the same rate as for repair of small cracks: $50 for the first repair and $10 each for up to two additional repairs.

State Farm outsourced management of the Program to Lynx Services, Inc., a company that specialized in insurance claim processing. Lynx operated two telephone call centers to take calls from insureds, document their claims, and, if

necessary, direct them to a local shop from a randomized computer generated list of Program members. Lynx representatives followed a script developed by State Farm to determine the type of windshield damage and process the claim. If the crack was within the driver's line of sight or was longer than six inches, the representative processed the claim as a replacement without raising the possibility of repair with the caller, though the caller remained free at his own initiative to choose repair rather than replacement. Under State Farm insurance policies, the insured paid a deductible for windshield replacement but State Farm covered the entire cost of a repair.

Mr. Campfield owns an automobile glass repair shop in Grand Junction, Colorado, and is the inventor of the patented Ultra Bond repair technique. The Ultra Bond method uses a resin with a higher viscosity rating than that used by other windshield repair methods. According to Mr. Campfield, this provides the structural integrity necessary to fill a larger crack. He claims that the Ultra Bond method can reliably repair cracks up to eighteen inches long, making the crack nearly invisible unless viewed perpendicularly to the slope of the windshield. He has licensed the Ultra Bond process for use by hundreds of glass shops nationwide. In 1998, Mr. Campfield demonstrated the Ultra Bond Process at the State Farm headquarters in an effort to gain endorsement by the insurer for repair of cracks longer than six inches, which, if successful, would have dramatically increased demand for his process. State Farm was unimpressed by Mr.

Campfield's demonstrations and retained the six-inch criterion for recommended replacement of cracked windshields.

Mr. Campfield and Ultra Bond Licensing, Inc. filed suit against State Farm and Lynx on February 19, 2003,[1] in the District Court of Colorado, alleging that the six-inch replacement criterion adopted by State Farm and followed by Lynx: (1) violated federal antitrust laws, namely Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and Section 4 of the Clayton Act, 15 U.S.C. § 4; (2) tortiously interfered with Ultra Bond's actual and prospective contractual relationships; and (3) violated the Colorado Consumer Protection Act ("CCPA"). State Farm and Lynx filed separate motions to dismiss for failure to state a claim. The district court dismissed the antitrust claims because Mr. Campfield failed to allege a legally relevant market, but denied the motions to dismiss the state law claims.

After extensive discovery, State Farm and Lynx filed separate motions for summary judgment. The district court found that Mr. Campfield's tortious interference claim was time barred to the extent that it was based on conduct occurring prior to February 19, 2001, and the CCPA claim was time barred to the extent that it was based on conduct prior to February 19, 2000. The court further held that each separate application of the six-inch criterion occurring subsequent to those dates started the limitations period as to that particular application.

---

[1] Mr. Campfield is the sole proprietor of Ultra Bond Licensing, Inc. For simplicity, we will refer to both plaintiffs as "Mr. Campfield."

The district court then granted the defendants' motion for summary judgment on the CCPA claim because there was no evidence that the application of the six-inch criterion involved a knowing and intentional misrepresentation by State Farm or Lynx. The court also held that Mr. Campfield had introduced no evidence of a significant public impact necessary to support a CCPA claim, but rejected Lynx's argument that the CCPA did not apply to its conduct because it was merely an agent acting on behalf of State Farm. The district court likewise granted the defendants' summary judgment motion on the tortious interference claim because Mr. Campfield failed to present evidence that any Ultra Bond licensee breached a contract or that the defendants' conduct was improper.

Mr. Campfield appeals the district court's dismissal of his antitrust claims, the grant of summary judgment on his CCPA and tortious interference claims, and the district court's decision not to rule on his pending objection to discovery orders prior to granting summary judgment. Both defendants cross-appeal the district court's decision that the applicable statutes of limitations did not bar all of Mr. Campfield's claims, and Lynx cross-appeals the district court's ruling that the CCPA applies to its conduct.

## II. Analysis

### A. Antitrust Claims

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

among the several States, or with foreign nations." 15 U.S.C. § 1. Section 2 states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce . . . shall be deemed guilty of a felony . . . ." *Id.* § 2. Mr. Campfield alleged that State Farm and Lynx violated both sections of the Sherman Act by engaging in price fixing, boycotting, entering exclusive dealing contracts to exclude Mr. Campfield from the market, and conspiring to monopolize or exercising monopoly power in the "State Farm insured repairable windshield repair market." Comp. ¶ 48. We affirm the district court's dismissal of these claims because Mr. Campfield failed to allege a relevant market, and cannot bring a per se claim because the defendants are not competitors.

### *1. Section 2 of the Sherman Act*

To state a cause of action for conduct prohibited under § 2 of the Sherman Act, the plaintiff must define a relevant market within which the defendants allegedly engaged in anticompetitive behavior. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966). Failure to allege a legally sufficient market is cause for dismissal of the claim. *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025–26 (10th Cir. 1992); *Apani Southwest, Inc. v. Coca-Cola Enters., Inc.*, 300

F.3d 620, 625–26 (5th Cir. 2002). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997) (citing cases). "Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir. 1978).

Mr. Campfield alleged that State Farm took advantage of its market power to depress demand for long crack repair. If true, these facts describe a monopsony. A monopsony is different from the usual form of monopolistic control in which suppliers utilize market power to restrict output and thereby raise prices. In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices. Herbert Hovenkamp, Antitrust 3 (3d ed. 1999). Monopsonistic practices by buyers are included within the practices prohibited by the Sherman Act. *Telecor Commc'ns, Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1134 (10th Cir. 2002) (citing *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 235–36 (1948)). When considering market power in a monopsony situation, "the market

is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991)). If the market described in the complaint fails to include "reasonably good substitutes" then the plaintiff has not adequately alleged a relevant market.

In his complaint, Mr. Campfield describes the market as "the State Farm insured repairable windshield repair market, in the geographic area of the United States of America." Comp. ¶ 54. Construing this portion of the complaint in the light most favorable to Mr. Campfield, the market he describes consists of the auto-glass shops that compete to provide windshield repair or replacement services to individuals who are insured by State Farms within the United States. This market definition is underinclusive. As the district court rightly concluded, "the relevant market is one that reflects the total market demand for plaintiffs' product, not just defendants' demand." App. 1956. Mr. Campfield's market description fails to include competitive substitutes; there are other consumers to which auto-glass repair shops may cater their services. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 331–32 (1961) ("While the relevant competitive market is not ordinarily susceptible to a 'metes and bounds' definition, it is of course the area in which respondents and the other 700

producers effectively compete."). Although State Farm and its insureds may be a significant consumer of automobile-glass repair and replacement services, Mr. Campfield has not alleged that State Farm insureds are the only consumers available to him. Mr. Campfield might offer his services to other automobile insurance companies or individual car owners who do not have glass coverage. Because these are reasonably interchangeable buyers, the relevant market includes all of these potential consumers of windshield repair and replacement services.

When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share. *See Jayco Sys., Inc. v. Savin Bus. Mach. Corp.*, 777 F.2d 306, 319 n.43 (5th Cir. 1985) ("[O]ne purchaser in a market of competing purchasers cannot constitute a relevant geographic market, absent exceptional market conditions."). Mr. Campfield has not alleged "exceptional market conditions" to justify these limitations on his market definition. *See, e.g.*, *Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86, 90 (E.D.N.Y. 1981) (finding that the United States Government was a relevant market for the sales of carrier-based aircraft and equipment). Without any explanation as to why we should not consider alternative buyers seeking similar services, even if State Farm "monopolized" the "State Farm insured windshield repair market" there is no illegal restraint of trade. ¶ 54. By failing to allege an appropriate market, Mr. Campfield has failed to state a claim under § 2 of the Sherman Act.

## 2. Section 1 of the Sherman Act

Mr. Campfield also alleges that State Farm and Lynx conspired to engage in price fixing, boycotting, exclusive dealing, and attempted to acquire monopoly power in violation of § 1 of the Sherman Act. Most claims under § 1 are subject to the "rule of reason," which requires us to analyze the relevant market power of the defendants and therefore requires the plaintiff to allege a valid market. *Diaz v. Farley*, 215 F.3d 1175, 1182 (10th Cir. 2000). Those claims brought by Mr. Campfield that fall under the rule of reason must fail because of the legally inadequate market definition within his complaint. Horizontal price fixing and group boycott, however, are per se violations, so Mr. Campfield's failure to allege a relevant market is not fatal to these claims. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 219 (1940) (horizontal price fixing is a per se violation); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (clarifying that group boycott must be horizontal to be per se illegal). Rather, the claims are inadequately pled because State Farm and Lynx are not competitors, and therefore cannot engage in a per se illegal, horizontal restraint of trade.

Per se violations are restricted to those restraints "that would always or almost always tend to restrict competition and decrease output." *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988) (internal citations omitted). This concern is greatest when actual competitors enter agreements because

-11-

cooperation among would-be competitors will "deprive[] the marketplace of the independent centers of decisionmaking that competition assumes and demands," and risk anti-competitive effects. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768–69 (1984). Vertical arrangements, on the other hand, do not generally give rise to the same concerns and often have pro-competitive effects. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2717–19 (2007); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637, 639–40 (10th Cir. 1973). To support a per se violation of the Sherman Act, a complaint alleging price fixing, group boycott, or an exclusive dealing arrangement must allege conspiracy by competitors. *See Elliot Indust. Ltd. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1123 n.29 (10th Cir. 2005) (claim of horizontal price fixing requires alleged conspiracy "among actual competitors (i.e. at the same level of distribution)"); *Key Financial Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 641–42 (10th Cir. 1987) (conspiracy could not comprise a per se illegal group boycott because defendants are not competitors of each other in the same horizontal market level); *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 (10th Cir. 1983) (finding that because none of the defendants compete with one another, the allegations are not sufficient basis for per se liability).

Because State Farm and Lynx are not competitors–they do not operate at the same market level–their cooperation cannot constitute a price fixing, group

boycott, or exclusive dealing arrangement sufficient for a per se violation of the Sherman Act. Therefore the rule of reason applies, and Mr. Campfield's failure to allege a legally relevant market requires dismissal of his claims.

**B. Colorado Consumer Protection Act**

Mr. Campfield's second claim is that the defendants violated the Colorado Consumer Protection Act by misrepresenting to consumers the risks of long crack repair and the advantages of replacement; engaging in price fixing; and intentionally failing to advise consumers of their option of either repair or replacement. Comp. ¶ 61. A CCPA claim consists of five elements: (1) the defendant engaged in an unfair or deceptive trade practice; (2) in the course of its business; (3) significantly impacting the public as actual or potential consumers of the defendant's goods; (4) the plaintiff suffered an injury in fact to a legally protected interest; and (5) the practice caused the injury. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003). In their motions for summary judgment, the defendants contended that Mr. Campfield failed to provide any evidence that the defendants engaged in an unfair or deceptive trade practice or that the practice resulted in a significant public impact. Lynx additionally argued that the CCPA cannot be applied to its actions because State Farm, rather than the general public, was the consumer of its services. The district court granted summary judgment in favor of the defendants, finding that there was insufficient evidence to show either a deceptive trade practice or

-13-

significant public impact.  We affirm on the basis that Mr. Campfield has failed to

provide sufficient evidence of an unfair or deceptive trade practice, and therefore

we do not reach the question of public impact.

The CCPA specifies nearly fifty different types of deceptive trade

practices.  Here, we are only concerned with alleged misrepresentations and

material omissions made by the defendants.  Colo. Rev. Stat. § 6-1-105(e),(g),(h),

& (u).  To be a deceptive trade practice under the CCPA, "a false or misleading

statement" must be made "with knowledge of its untruth, or recklessly and

willfully made without regard to its consequences, and with an intent to mislead

and deceive the plaintiff."  *Rhino Linings*, 62 P.3d at 147 (internal citation

omitted).  A material omission is a deceptive trade practice if the defendant failed

to "disclose material information . . . which information was known at the time of

an advertisement or sale if such failure to disclose such information was intended

to induce the consumer to enter into a transaction."  Colo. Rev. Stat. § 6-1-105(u).

Mr. Campfield points to statements made by Lynx representatives to State Farm

insureds about windshield replacement versus repair as false or misleading

statements made by the defendants.  He also contends that the failure of Lynx

representatives to inform insureds that they have the option of either replacement

or repair was a material omission.  The district court concluded that Mr.

Campfield had failed to provide any evidence of a deceptive trade practice

because the statements made by Lynx representatives were recommendations

-14-

rather than "knowing and intentional concealment or misrepresentation." App. 1962.

Mr. Campfield's best evidence of misrepresentation is the transcript of a conversation between a windshield-repair customer and a Lynx representative in which the representative states: "[I]f it's longer than a dollar bill you will need a new windshield. They can't repair anything longer than a dollar bill. . . . [W]e're told anything over a dollar bill can't be done because it won't hold." App. 640. The district court seems not to have considered these particular statements. If State Farm believed these representations to be false—State Farm believed that cracks longer than a dollar bill *could* be successfully repaired—the statements might be sufficient to give rise to liability under the CCPA. Mr. Campfield's claim fails, however, because he does not provide evidence from which a jury could conclude that State Farm knew the statements to be false or made the statements with reckless disregard for their truth.

Mr. Campfield admitted in his deposition that, for at least eighteen years and up to the time of the suit, industry standards dictated that repairs of cracks longer than six-inches would not hold; "Six inches was what the industry said in their manuals was repairable because the resin could not withstand the stress." App. 728. In spite of the lack of industry endorsement of long crack repair, Mr. Campfield claims that State Farm knew that long cracks could be successfully repaired because he had informed State Farm by letter and by his in-person

-15-

demonstration that the Ultra Bond process could reliably repair cracks up to eighteen inches long. Although this evidence shows that State Farm was aware of Mr. Campfield's method for repairing long cracks, it does not show that State Farm believed that the method was adequate. State Farm's Report on long crack repair methods reflects concern that long crack repairs would not hold in the long term. The Report states that although "[t]he initial strength of the repaired cracks may be good (there is no way to really be sure), however the true concern is the long term durability of the repair," App. 2143 (State Farm Report, March 9, 1998, "Evaluation of Windshield Long Crack Repair"). "There have been numerous independent tests performed in a lab environment, however this does not take into account real world concerns for long term durability." *Id.* at 2141. Mr. Campfield fails to provide any countervailing evidence to show that State Farm subjectively believed the Ultra Bond process to be an adequate process for repairing long cracks. Without evidence of knowing misrepresentation, Mr. Campfield cannot rely on the statements made by the Lynx representative to show a violation of the CCPA.

Mr. Campfield also contends that the failure of the Lynx representative to inform the insured that he or she is free to choose between repair or replacement is a material omission intended to induce insureds to select replacement rather than repair. The script followed by Lynx representatives to process a long crack did not inform the insured that he or she was free to choose between repair or

-16-

replacement. If the crack was longer than six inches the damage was processed as a replacement unless the insured, of his own volition, requested a repair. But because there is no evidence that defendants believed long cracks to be repairable, the Lynx representatives' failure to inform insureds that they may opt for repair rather than replacement could not have been intended to "induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105(u). Therefore, Mr. Campfield has not presented sufficient facts of a CCPA violation to survive summary judgment.

**C. Tortious Interference with Current and Prospective Business Relations**

Mr. Campfield's complaint presented two theories of tortious interference by State Farm and Lynx. He first alleged that the defendants wrongfully interfered with current and prospective licensees of the Ultra Bond process by providing false information to State Farm insureds and refusing to include market-rate compensation for long crack repair within the Agreement. Comp. ¶ 73. He also alleged that the defendants steered away potential patrons of his windshield repair shop by falsely informing them that his services would not be reimbursed by State Farm, that long crack repair is more dangerous than windshield replacement, and that the repair could adversely affect warranties on their vehicle or future insurance premiums. Comp. ¶ 74. The latter argument was not raised by Mr. Campfield in his briefs in opposition to the defendants' motion

for summary judgment to the district court, nor in his appellate briefs. This argument is therefore waived.

A claim of tortious interference with current business relations requires Mr. Campfield to show: (1) he had a contract with a third party; (2) defendants knew of the contract's existence; (3) defendants intentionally induced the third party to breach the existing contract; (4) defendants acted improperly; and (5) defendants' actions caused plaintiff to incur damages. *Steinbach v. Dillon Cos., Inc.*, 253 F.3d 538, 540 (10th Cir. 2001). Tortious interference with prospective business relations requires identical elements, with the exception that an existing contract need not be alleged. Rather, Mr. Campfield must show that there was a reasonable likelihood that a contract would have resulted but for the wrongful interference. *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995). We affirm the district court's grant of summary judgment in favor of the defendants because Mr. Campfield has failed to provide sufficient evidence of an improper act.

Mr. Campfield claims that misrepresentations made by Lynx representatives induced insureds not to seek windshield repair services, which interfered with his current and prospective licensing contracts by depressing demand for the Ultra Bond process. For the same reasons that Mr. Campfield is unable to show misrepresentations or omissions that constituted a deceptive trade practice under the CCPA, Mr. Campfield is unable to show that the defendants made knowing misrepresentations to insureds that qualify as a wrongful act for

purposes of tortious interference. Therefore, this theory of tortious interference must fail.

Mr. Campfield's remaining theory of tortious interference is that by refusing to pay a fair market rate for long crack repair under the Agreement, State Farm wrongfully interfered with his current and prospective business relations with licensees or potential licensees. His claim also fails because he does not provide sufficient evidence of a wrongful act. There is no evidence in the record from which a reasonable jury could conclude that the lack of a reasonable reimbursement rate for long crack repair was anything other than a legitimate business practice. Rather, even drawing all inferences in favor of Mr. Campfield, the evidence unequivocally supports the conclusion that State Farm maintained the same reimbursement rate for all types of crack repair because of concerns about the long term durability of long crack repair and consumer dissatisfaction with the appearance of the repair. Such competitively motivated behavior is not, by itself, improper.

State Farm reimbursed glass shops $50 per repair, no matter how long the crack. Mr. Campfield claims that $100 to $150 is fair market rate for the repair of a long crack. App. 943 (repairs done at Mr. Campfield's shop cost on average $116.80); App. 1099, 1102, 1113, 1126. State Farm, however, provides undisputed evidence of legitimate reasons for discouraging long crack repairs. In its March 9, 1998, "Evaluation of Windshield Long Crack Repair" Report on

methods demonstrated by various vendors, State Farm expressed concerns about the process that were not, in its judgment, resolved by the demonstrations. These concerns included the durability and visibility of long cracks after repair. The Report noted that the inconsistencies among methods created "confusion over whether or not long crack repair provides a good long-term solution." App. 2141. Although "[t]he initial strength of the repaired cracks may be good (there is no way to really be sure) . . . the true concern is the long term durability of the repair." App. 2143. The report notes that although lab tests had been conducted on the repair processes, these do "not take into account real world concerns for long term durability." App. 2141. State Farm was also not satisfied with the aesthetic result of the repairs; "[a]ll but one of the repairs allows some or a lot of light refraction that accentuates the crack itself and makes for an unsightly final repair." App. 2142. The question is not whether State Farm was correct in these assessments but whether State Farm "desired to bring about the interference [with Mr. Campfield's licensees] as a sole or partial reason for [its] conduct." Restatement (Second) of Torts, § 767, comment d (1977); *Trimble v. City and County of Denver*, 697 P.2d 716, 726 (Colo. 1985) (overruled by statute on other grounds). Mr. Campfield has failed to provide any evidence to contradict the legitimate business motives expressed in the Report. Given the Report's documentation of State Farm's bases for recommending against and under-compensating long crack repair, there is no reasonable basis on which a jury

could conclude that State Farm's repair policy wrongfully interfered with Ultra Bond licensing contracts.

The Restatement explicitly states that "competition is a necessary or desirable incident of free enterprise," Restatement (Second) of Torts § 768, cmt. e. We recognize that § 768 of the Restatement, which narrows the scope of tortious interference if parties are in direct competition with one another, does not apply here because State Farm and Lynx are not in competition with Mr. Campfield. Nonetheless, the above statement is a generally applicable principle. A legitimate business activity intended to achieve an advantage over competitors, but which does not rely on improper methods, cannot provide a basis for liability—even if, as here, a non-competitor is harmed as a result. *See R-G Denver, Ltd. v. First City Holdings of Colo.*, 789 F.2d 1469, 1476–77 (10th Cir. 1986).

Mr. Campfield also alleges in his complaint that State Farm "conspired to set prices so low as to make it economically unfeasible for a repair entity to exist profitably." Comp. ¶ 73. Improper exercise of market power in an anti-competitive manner is wrongful conduct on which a claim of tortious interference might be based. Mr. Campfield does not, however, expand this theory of liability in his briefs before the district court or those before us. It is unclear from the complaint with what entity State Farm is alleged to have conspired, or how such a conspiracy would allow State Farm to set less-than-competitive rates for long

-21-

crack repair. That auto glass repair shops could no longer exist profitably is not itself evidence of a wrongful act by State Farm—the more likely explanation is that there is simply not enough demand by the market for windshield crack repair to support specialized shops.

The only evidence of wrongful conduct offered by Mr. Campfield is Lynx's status as the wholly owned subsidiary of PPG, the largest manufacturer of windshields in the United States. Mr. Campfield suggests that the defendants intentionally under-compensated long crack repairs to increase the sale of windshields. Even if such a scheme qualified as a wrongful act under the tort, Mr. Campfield's allegations are insufficient because there is no evidence of a causal relationship between PPG's interest in selling windshields and the adoption of the long-crack compensation policy by State Farm. State Farm's agreement with Lynx explicitly states that "State Farm will establish the pricing that State Farm will offer to glass facilities under the O&A Program." App. 2230. Mr. Campfield is unable to show that Lynx was involved in negotiating the terms of the agreements or had any other opportunity to influence State Farm in setting its long crack policy. There is, therefore, no basis on which a jury could conclude that the agreements were imposed to increase PPG's windshield sales. Because Mr. Campfield has failed to provide sufficient evidence of any wrongful act by the defendants, we affirm the district court's grant of summary judgment.

## D. Pending Discovery Motions

Mr. Campfield lastly objects that the district court ought not to have ruled on the defendants' summary judgment motions without considering his objections to the magistrate judge's order denying his discovery requests. During discovery, Mr. Campfield filed two motions to compel, seeking among other things: (1) a list identifying O&A participant glass shops; (2) Lynx's list of "repair only" glass shops; and (3) every recorded telephone conversation that any Lynx representative had with a State Farm insured. The magistrate judge conducted a full hearing on the motions, denied the motions for the production of the O&A list and "repair only" shops list, and ordered Lynx to produce State Farm recordings only at Mr. Campfield's expense. Mr. Campfield filed objections to the order. The district court did not rule on these objections prior to granting the defendants' motion for summary judgment. We review the district court's decision to grant summary judgment without ruling on a pending discovery motion for abuse of discretion. *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992).

Because Mr. Campfield failed to file an affidavit under Fed. R. Civ. P. 56(f) explaining "why facts precluding summary judgment cannot be presented," which is the proper procedure by which to request further discovery prior to the court's ruling on a summary judgment motion, he has waived the argument that the grant of summary judgment should be set aside for lack of sufficient

discovery. *Trask v. Franco*, 446 F.3d 1036, 1042 (10th Cir. 2006) (citation omitted). Rule 56(f) states that "[i]f a party opposing the [summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," the court may deny the motion, order a continuance for additional discovery to be undertaken, or issue any other order that is appropriate. But "[w]here a party opposing summary judgment . . . fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate." *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 832–33 (10th Cir. 1986). Because Mr. Campfield did not file an affidavit, the district judge did not abuse his discretion in granting summary judgment based on the record before him.

### III. Conclusion

We **AFFIRM** the district court's dismissal of plaintiffs' Sherman Act claims; **AFFIRM** the district court's grants of summary judgment of plaintiffs' state law claims; and **AFFIRM** the district court's exercise of discretion to grant summary judgment without considering the plaintiffs' objection to pending discovery orders. Because we grant summary judgment, we do not address whether any of the plaintiffs' claims would be precluded by the applicable statutes of limitations.