Filed 3/29/24  State of California ex rel. Campfield v. Safelite Group CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| STATE OF CALIFORNIA, ex rel. RICHARD CAMPFIELD,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SAFELITE GROUP, INC., et al.,<br><br>    Defendants and Respondents. | A168101<br><br>(San Francisco City & County Super. Ct. No. CGC-20-585404) |

Richard Campfield, as relator for the State of California, appeals after the trial court sustained the demurrer of defendants Safelite Group, Inc. and its subsidiaries, Safelite Solutions LLC and Safelite Fulfillment, Inc. (collectively, Safelite) without leave to amend on statute of limitations grounds.  Campfield contends he adequately alleged a cause of action under the Insurance Fraud Prevention Act (Ins. Code, § 1871 et seq.) (IFPA) within the statute of limitations.  We will affirm the judgment on the alternative ground that Campfield's complaint fails to allege with particularity facts constituting a cause of action under the IFPA.

1

## BACKGROUND

Because this appeal comes to us after the trial court sustained Safelite's demurrer without leave to amend, we draw the relevant facts from the complaint. (*Wilson v. Hynek* (2012) 207 Cal.App.4th 999, 1002.)

Campfield owns a windshield repair company that licenses and sells products for repairing vehicle windshield cracks. Safelite is the nation's largest retailer of vehicle glass repair and replacement services. Safelite also serves as the third party administrator for over 175 insurance and fleet companies, including 23 of the top 30 insurers in California and the country, for processing and adjusting policyholders' vehicle glass damage claims, and it has direct electronic access to over 20 insurance company databases.[1]

Beginning in the 1970s, the windshield repair industry believed it was infeasible to repair cracks longer than six inches and that such a crack required replacement of the windshield. Consistent with this belief, for years Safelite used this rule in its marketing materials. In 2005, an industry standards committee that included Campfield and a Safelite employee adopted a standard allowing repair of cracks up to and including 14 inches long. The American National Standards Institute approved the

---

[1] The complaint occasionally differentiates between Safelite Fulfillment, Inc. as the windshield repair and replacement service provider and Safelite Solutions LLC as the third party administrator. At other times, however, the complaint refers generically to Safelite as conducting both activities. We will also refer generally to Safelite regardless of which subsidiary performs any specific activity.

2

14-inch standard in 2007 and approved an updated version in 2014.

Windshield repair generally costs less than $150, while windshield replacement in older cars costs less than $500 and in newer cars can cost $1,500 or more. Windshield repair is also safer than replacement because a windshield is important for safety reasons and the factory seal between a windshield and a vehicle is stronger than the seal on a replacement windshield. Accordingly, as a result of the new 14-inch standard, insurers began pushing for repair of cracks longer than six inches. But because windshield replacement is more profitable for Safelite than repair, Safelite continued to insist that repair of cracks longer than six inches was not safe. Safelite maintained the six-inch rule in discussions with insurers, educational materials for insurance agents, and general marketing materials. Safelite's campaign was a success, as no insurer in the United States for which Safelite acts as the third party administrator has adopted the 14-inch standard.

In 2015, Campfield sued Safelite in federal district court in Ohio, alleging Safelite's continued reliance on its six-inch rule violated the Lanham Act's (15 U.S.C. § 1051 et seq.) prohibition on false advertising. Through discovery in that action, Campfield uncovered internal Safelite documents demonstrating Safelite's knowledge that the six-inch rule was baseless. For example, in 2007, Safelite told insurers that it was not safe to repair a windshield with a crack longer than six inches, even though it privately admitted that safety was "not an issue." In 2008,

3

Safelite executives discussed that repair of windshield cracks up to 24 inches long could be safe and viable. Safelite admitted in responses to interrogatories in the Ohio action that it has never conducted studies on the safety or viability of repair of cracks longer than six inches.

Discovery in the Ohio action revealed how Safelite flooded the market with false statements about the six-inch rule. Safelite makes these misrepresentations through statements to the media by senior Safelite leadership, advertisements, news releases, statements on Safelite's website, videos on its website and YouTube, brochures distributed to individual consumers and insurance agents, and statements by call center representatives and repair technicians. When Safelite acts as an insurer's third party administrator, a policyholder using the insurer's website to file a claim for windshield damage is forwarded to Safelite's website containing this misinformation. Safelite includes the statements in materials it prepares for insurance companies that it contracts with, which present the statements as their own. Safelite also presents the information to insurance companies and their agents in training bulletins.

The owner of a windshield repair shop testified in a deposition in the Ohio action. He interacts with large insurance companies, including Farmers, Allstate, Liberty Mutual, Progressive, Geico, Ameriprise, and 21st Century. Except for Ameriprise, all of these companies use Safelite as their third party administrator. None of these companies covers the repair of windshield cracks longer than six inches due to Safelite's false

4

statements about the safety and durability of such repairs. According to this shop owner, the insurance companies that use Safelite to handle their glass claims do not know how "ruthless" Safelite is.

On July 15, 2020, Campfield filed under seal the complaint in the present action against Safelite, alleging a single qui tam cause of action for violation of the IFPA. The Insurance Commissioner and the San Francisco County District Attorney declined to intervene, so in September 2022 the trial court unsealed the complaint. At the initial case management conference, the trial court stayed all discovery pending decision on a demurrer Safelite intended to file. Campfield therefore did not attempt to enforce subpoenas he had issued to third parties.

Safelite then demurred, arguing, among other things, that the complaint failed to allege facts constituting a cause of action under the IFPA, Campfield failed to plead his claim with sufficient particularity, and the statute of limitations barred the complaint. In support of the statute of limitations argument, Safelite pointed out that Campfield had filed a lawsuit in 2003 against an insurer and its third party administrator raising the same argument about the viability of repairing cracks longer than six inches (*Campfield v. State Farm Mut. Auto. Ins. Co.* (10th Cir. 2008) 532 F.3d 1111, 1116), as well as two suits against Safelite in 2004 and the 2015 Ohio action raising the same allegations. After briefing and a hearing, the trial court sustained the demurrer without leave to amend based on the statute of limitations and noted that Safelite had raised

5

"substantial arguments" that the complaint had not stated a cognizable claim and that the action was barred by the IFPA's public disclosure bar. The trial court then dismissed the action.

## DISCUSSION

### I. Legal Background and Standard of Review

"The IFPA was enacted to prevent automobile and workers' compensation insurance fraud in order to, among other things, 'significantly reduce the incidence of severity and automobile insurance claim payments and . . . therefore produce a commensurate reduction in automobile insurance premiums.' " (*People ex rel. Allstate Ins. Co. v. Discovery Radiology Physicians, P.C.* (2023) 94 Cal.App.5th 521, 542 (*Discovery Radiology*).) "[T]he IFPA contains a qui tam provision that allows any interested person to bring an action for damages and penalties for fraudulent insurance claims on behalf of the individual and the State of California (Ins. Code, § 1871.7, subd. (e)(1)). The person bringing the qui tam action, referred to as the 'relator,' stands in the shoes of the State of California, which is deemed to be the real party in interest. [Citations.] The relator in an Insurance Code section 1871.7 qui tam action does not personally recover damages, but if successful receives a substantial percentage of the recovery as a bounty." (*Ibid*.)

The sole cause of action in the complaint is based on Insurance Code section 1871.7, subdivision (b), which allows for the imposition of civil penalties and other remedies against anyone who violates Insurance Code section 1871.7 or Penal Code sections 549, 550, or 551. Campfield alleges Safelite violated

6

Penal Code section 550, subdivision (b)(1) and (2), which make it unlawful to "[p]resent or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact" (*id.*, subd. (b)(1)) or "[p]repare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact" (*id.*, subd. (b)(2)).[2]

"As in any action sounding in fraud, an IFPA action must be pleaded with particularity. 'In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] . . . "This particularity requirement necessitates pleading *facts* which 'show how, when, where, to whom, and by what means the representations were tendered.' " ' [Citation.] [¶]

_____

[2] The complaint also alleges Safelite violated Penal Code section 550, subdivision (a)(1), (4), and (5). However, in his opening brief Campfield argued only that his complaint properly stated a claim based on Penal Code section 550, subdivision (b)(2). Safelite argued in its respondent's brief that Campfield had abandoned his reliance on Penal Code section 550, subdivision (a)(1), (4), and (5). In his reply, Campfield mentioned only Penal Code section 550, subdivision (b)(1) and (2). We conclude from this that Campfield has abandoned his theory based on Penal Code section 550, subdivision (a)(1), (4), and (5). However, even if Campfield intended to preserve that theory, the complaint fails to state a claim based on that theory for the same reasons explained *post*.

' "The specificity requirement serves two purposes. The first is notice to the defendant, to 'furnish the defendant with certain definite charges which can be intelligently met.' [Citations.] The pleading of fraud, however, is also the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings. Thus, the pleading should be sufficient ' "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." ' " ' " (*Discovery Radiology*, *supra*, 94 Cal.App.5th at pp. 548–549.) The particularity requirement also serves " ' "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." ' " (*State of California ex rel. McCann v. Bank of America, N.A.* (2011) 191 Cal.App.4th 897, 909 [discussing heightened pleading standard in context of California False Claims Act (Gov. Code, § 12650 et seq.)]; *State ex rel. Wilson v. Superior Court* (2014) 227 Cal.App.4th 579, 596 [IFPA's qui tam procedures were modeled on California False Claims Act].)

" ' "On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo: we exercise our independent judgment about whether the complaint states a cause of action as a matter of law. [Citation.] First, we give the complaint a reasonable interpretation, reading it as a

8

whole and its parts in their context.  Next, we treat the demurrer as admitting all material facts properly pleaded.  Then we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.] [¶] We do not, however, assume the truth of contentions, deductions, or conclusions of law." ' " (*Discovery Radiology*, *supra*, 94 Cal.App.5th at p. 532.)  When a trial court sustains a demurrer without leave to amend, the plaintiff has the burden of proving a reasonable possibility of curing the defect by amendment.  (*Id.* at pp. 532–533.)

## II.    Analysis

To state his IFPA cause of action, Campfield must allege facts showing that Safelite presented or caused to be presented a false statement "as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy" (Pen. Code, § 550, subd. (b)(1)) or prepared or made a false statement "intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy" (*id.*, subd. (b)(2)).  Campfield alleges Safelite violated these provisions when it prepared and presented false statements to insurance companies either as insurers' third party administrator or as a windshield repair and replacement service.  The complaint fails to allege facts constituting a cause of action based on either activity.[3]

_____

[3] The trial court sustained Safelite's demurrer on statute of limitations grounds.  We, too, have serious doubts that Campfield can avoid the statute of limitations bar without any direct allegations of activity in the period by relying entirely on

9

## A. *Third party administrator*

As Campfield acknowledges, "an insurer is not 'subject to a qui tam action under [Insurance Code] section 1871.7 based on its marketing and claims handling practices.' " (*State of California ex rel. Metz v. Farmers Group, Inc.* (2007) 156 Cal.App.4th 1063, 1068; accord, *State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442, 450–451 (*Nee*).) This is because "the IFPA expressly targets only deceptive conduct directed at insurers, not improper conduct by insurers." (*People ex rel. Ellinger v. Magill* (2022) 77 Cal.App.5th 287, 294; accord, *Nee*, at pp. 449–450.) This principle also extends to insurers' agents. Insurance Code section 1871.7, subdivision (b) "must be viewed as excluding the insurer that receives and handles an insured's claim, as well the insurer's agents and affiliates aiding in the processing of the claim." (*Metz*, at p. 1071.)

Campfield alleges Safelite acts as a third party administrator for scores of insurers, including 23 of the top 30 insurers. When policyholders file claims for windshield damage on their insurers' websites or via phone, they are forwarded to Safelite to handle the claim. Safelite provides claims

---

Safelite's statements preceding the limitations period, in some cases by a decade. We also agree with the trial court that Safelite raises a substantial argument that the complaint is barred by the IFPA's public disclosure rule, given the lawsuits Campfield has already filed against Safelite. (Ins. Code, § 1871.7, subd. (h)(2).) But we need not address these issues given our conclusion that Campfield's complaint fails to allege facts constituting a cause of action.

management services with direct access to insurers' computer systems. For the purposes of the IFPA, then, when Safelite is approving or denying claims for an insurer, it is not making or preparing statements in support of or opposition to them, either to insurers or policyholders, in a way that Penal Code section 550, subdivision (b)(1) or (2) prohibits. As *Nee* explained, "Insurers do not 'support' or 'oppose' claims, they 'approve' or 'deny' them. Nor do insurers submit 'statements' as part of 'a claim for payment.' " (*Nee, supra,* 140 Cal.App.4th at p. 450.) The same is true of Safelite in its work as a third party administrator, so that activity cannot support liability under the IFPA.

## B.  *Windshield repair and replacement service provider*

It is theoretically possible to state an IFPA cause of action against Safelite as a service provider for submitting windshield replacement claims to insurers for which Safelite does not act as the third party administrator. However, Campfield has not alleged facts to support such a claim.

Penal Code section 550, subdivision (b)(1) makes it unlawful to "[p]resent or cause to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy knowing that the statement contains any false or misleading information concerning any material fact." Subdivision (b)(2) of that statute similarly makes it unlawful to "[p]repare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in

11

support of or opposition to any claim or payment or other benefit pursuant to an insurance policy knowing that the statement contains any false or misleading information concerning any material fact." Thus, to allege an IFPA claim based on a violation of these provisions, a relator must allege a nexus between a false statement and a claim for benefits. Because of the particularity requirement, the relator must allege facts demonstrating this nexus with specificity. (*Discovery Radiology*, *supra*, 94 Cal.App.5th at pp. 548–549.)

*Discovery Radiology* demonstrates the types of allegations that satisfy this requirement. The relator in that case, an insurance company, alleged that several medical corporations held themselves out as providers of radiology services and appeared to be owned by licensed physicians as required by state law. (*Discovery Radiology*, *supra*, 94 Cal.App.5th at p. 527.) But in reality, the corporations were radiology brokers that were owned by a non-physician and sent patients to radiologists in exchange for kickbacks. (*Id.* at pp. 529–530.) The Court of Appeal held that the relator's complaint pled IFPA claims based on this scheme with sufficient particularity. (*Discovery Radiology,* at p. 549.) The complaint identified the role each defendant played in the scheme, including the defendant physicians who agreed to appear on paper as owners of the medical corporations despite exercising no significant control and the defendant non-physician who actually controlled the corporations. (*Ibid.*) The complaint alleged how the non-physician entered into contracts with radiology facilities to

12

perform magnetic resonance imaging (MRI) scans and with radiologists to interpret the scans, recruited patients from personal injury attorneys, referred the patients to the contracted radiology facilities and radiologists, and prepared and sent bills under the name of the medical corporation to the attorneys, knowing that the attorneys would present the bills to the insurance company. (*Ibid.*) The complaint "identifie[d] each allegedly false insurance claim by claim number, and additionally provide[d], for each claim, the date of treatment, the provider name that appeared on the claim, the amount billed, and the name of the attorney who submitted the claim" to the insurance company. (*Ibid.*) The Court of Appeal rejected an argument that the complaint should have alleged the dates of each false bill, noting that the complaint already alleged the date of treatment and claim numbers from which the false claims could be identified. (*Id.* at p. 550.) The court also found the complaint adequately alleged what was false about the claims, noting that the complaint alleged the claims were deceitful because the medical corporations on whose behalf the attorneys submitted the bills were owned by a non-physician and the medical corporations falsely represented that they had performed and read the MRI scans. (*Ibid.*)

Campfield's complaint does not allege anything close to this. The complaint describes numerous statements over the span of two decades by Safelite about the safety of repairing windshield cracks longer than six inches, including statements to insurers and their agents about the technical feasibility of

13

repairing cracks longer than six inches and advertisements and marketing materials aimed at insurers, their agents, and individual consumers. These communications include text and videos on Safelite's website; YouTube videos; Safelite brochures, including those distributed to third party organizations like AAA; statements by Safelite's call center employees and repair technicians; and TV, radio, and print interviews. Campfield provides examples of each kind of communication, but none of the communications described concerns a claim for insurance benefits by an individual consumer. Instead, as Campfield summarizes, they amount to a broad-based, years-long public relations campaign to change the overall perception in the market about the feasibility of repairing windshield cracks longer than six inches. Even if this campaign were in bad faith or duplicitous, as Campfield alleges, and regardless of whether it violated any other laws[4], it does not support a cause of action under the IFPA because Campfield has not alleged that the campaign was connected to or in support of any specific claims for insurance benefits, as the statute requires. (*Discovery Radiology, supra,* 94 Cal.App.5th at pp. 548–549 [plaintiff must allege " ' "*facts* which 'show how, when, where, to whom, and by what means the representations were tendered' " ' "]; cf. *People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 539–542 [describing

---

[4] The Ohio district court granted summary judgment for Safelite on Campfield's claim of false advertising under the Lanham Act (15 U.S.C. § 1051 et seq.), but on January 16, 2024, the Sixth Circuit reversed that ruling. (*Campfield v. Safelite Group, Inc.* (6th Cir. 2024) 91 F.4th 401.)

IFPA claims founded upon submission of false claims to two insurance companies based on at least 126 "staged" automobile accidents resulting in at least 416 fraudulent insurance claims].) Allowing a claim like Campfield's to proceed in the absence of such concrete factual allegations would in effect convert the IFPA into a law prohibiting false advertising to insurers, which is not the IFPA's purpose. (*Weitzman*, at p. 548 [legislature amended IFPA to apply to automobile insurance fraud based on evidence of " 'complex rings of dishonest lawyers, health professionals, "cappers" and insureds' " who defrauded insurers " 'by staging accidents, filing claims for "paper" accidents and padding medical and legal bills with treatment and services never rendered' "].)

Campfield argues that he need not identify any specific claim submitted to an insurer because Penal Code section 550, subdivision (b)(2) makes it unlawful to prepare a statement merely with the intent that it be presented to an insurer, even if the statement is never actually presented to an insurer. Campfield is correct that he need not allege a claim was actually presented to support liability under Penal Code section 550, subdivision (b)(2). But he still must satisfy the statute's nexus requirement by identifying some individual claim to which a statement was connected, such as by providing a claim number, name of insurer, name of insured, date, amount of claim, or type of repair involved. (See *Discovery Radiology*, *supra*, 94 Cal.App.5th at p. 549 ["complaint identifies each allegedly false insurance claim by claim number, and additionally provides, for each claim, the date of treatment, the provider name that

15

appeared on the claim, the amount billed, and the name of the attorney who submitted the claim"].)

Campfield further contends, based on a few federal district court decisions, that he need not identify any specific claims as long as he alleges a scheme that raises a strong inference that fraudulent claims were actually submitted. (*United States v. Crescendo Bioscience, Inc.* (N.D.Cal. May 23, 2020, No. 16-cv-02043-TSH) 2020 U.S. Dist. Lexis 90940, \*26–\*29; *United States ex rel. Puhl v. Terumo BCT* (C.D.Cal. Sept. 12, 2019, No. CV 17-8446 PSG (JPRx)) 2019 U.S. Dist. Lexis 220813, \*6–\*9; *United States v. CardioDx, Inc.* (N.D.Cal. May 17, 2019, No. 15-cv-01339-WHO) 2019 U.S. Dist. Lexis 83784, \*23–\*25 (*CardioDx*).) He also argues that pleading requirements should be relaxed because relevant information about specific claims is in Safelite's hands. (See *CardioDx*, at \*16–\*20 [applying federal heightened pleading standard].) Campfield essentially asks us to infer that because Safelite made false statements in its public relations campaign about the repairability of cracks longer than six inches, that in its capacity as a windshield repairer, it is continuing to tell insurers that specific policyholders' windshields require replacement rather than repair.

One of the federal decisions Campfield cites, *United States ex rel. Puhl v. Terumo BCT*, *supra*, 2019 U.S. Dist. Lexis 220813, at \*9, actually dismissed a qui tam action because the plaintiff failed to include "more information about how the scheme functioned, including '*what* claims were submitted to the federal government; *when* such claims were submitted to the federal

16

government; or *who* submitted such claims to the federal government.' " These are precisely the kind of factual allegations that *Discovery Radiology*, *supra*, 94 Cal.App.5th at pp. 549–550, found sufficient but that are missing in Campfield's complaint. Similarly, the plaintiff in *United States v. Crescendo Bioscience, Inc.* identified the managed care companies harmed by the defendant's alleged fraud and the health plans they served, while Campfield has identified no such specific victims. (*United States v. Crescendo Bioscience, Inc.*, *supra*, 2020 U.S. Dist. Lexis 90940, at *38–*39.)

Campfield quotes *CardioDx* as holding that an IFPA plaintiff did not have to "identif[y] which private insurers received claims for payments (from [the defendant]), when those claims were submitted, or how the specific requirements of those private insurance contracts were violated." (*CardioDx*, *supra*, 2019 U.S. Dist. Lexis 83784, at *23–*24.) However, *CardioDx* made this remark about an IFPA claim under Insurance Code section 1871.7, subdivision (a), not subdivision (b). The difference is significant because, as *CardioDx* noted, "it is the employment of others to 'procure clients' that violates" Insurance Code section 1871.7, subdivision (a), not the submission of any specific claims. (*CardioDx*, at *24, citing *State ex rel. Wilson v. Superior Court*, *supra*, 227 Cal.App.4th at p. 593.)

*CardioDx* did also find that relator's complaint adequately plead a cause of action based on subdivision (b) of Insurance Code section 1871.7 and Penal Code section 550, subdivision (a)(1), (a)(5), and (a)(6), when it alleged that medical providers who

17

ordered and administered a company's test received an illegal kickback. (*CardioDx*, *supra*, 2019 U.S. Dist. Lexis 83784, at *8–*9, *25.) But the relator in *CardioDx* alleged the illegal kickbacks affected every claim submitted to a government insurance program based on the administration of the test. (*Ibid.*)

We have no quarrel with *CardioDx*'s conclusion that a plaintiff adequately pleads an IFPA claim by alleging a defendant's fraudulent scheme affected every claim the defendant submitted to insurers, even without identifying specific claims. Thus, had Campfield alleged here that Safelite's fraud affected every windshield replacement claim it submitted to insurers, his complaint might well pass muster. But the complaint indicates that Safelite's alleged fraud affected only those claims involving cracks from 6 to 14 inches long that would otherwise have been eligible for repair. Even the industry standard that Campfield cites as evidence of the falsity of Safelite's six-inch standard, however, indicates that some cracks of any size cannot be repaired, depending on the type of crack and its location on the windshield. The standard notes 11 circumstances in which windshields should not be repaired, including when (1) a crack penetrates both layers of laminated glass, (2) damage occurs in the driver's primary viewing area and is longer than one inch, (3) damage or its repair will affect features such as rain sensors or heads-up displays, or (4) a crack's repair will, in the technician's judgment, affect the proper operation of the vehicle. Because, unlike the scheme in *CardioDx,* Safelite's alleged statements did

18

not affect the entire universe of claims submitted to insurers for reimbursement and there is apparently a variety of factors impacting the decision to repair or replace a windshield, Campfield needed to identify with specificity one or more claims affected to allow Safelite to meet Campfield's charges intelligently.[5]  (*Discovery Radiology, supra,* 94 Cal.App.5th at p. 548 [one purpose of the specificity requirement for IFPA claims is to " 'furnish the defendant with certain definite charges which

---

[5] Campfield also needed to identify claims with specificity to establish two other elements of his IFPA claim, that Safelite misrepresented a material fact (Pen. Code, § 550, subd. (b)(1) & (2)) and that it acted with intent to defraud (*People ex rel. Government Employees Ins. Co. v. Cruz* (2016) 244 Cal.App.4th 1184, 1193).  The only insurer identified in the complaint for whom Safelite does not act as a third party administrator, Ameriprise, apparently refuses as a general policy to cover repairs of windshield cracks longer than six inches.  Thus, so far as we can tell from the complaint, the insurance industry has adopted a blanket policy of not covering such repairs.  We cannot see, then, how Safelite's view that any individual cracked windshield could not be repaired would be material to an insurer. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 [misrepresentation is material "if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' "].) Nor is it apparent how Safelite can deceive insurers that a windshield must be replaced because of a crack longer than six inches, since the insurers already believe replacement is necessary.  Indeed, Campfield's original complaint in the Ohio action suggests that insurers refuse to cover repairs of such cracks to save themselves money:  Crack repairs are not subject to policy deductibles so insurers pay the full cost, while they pay for windshield replacements only after deductibles are exhausted. We need not delve into such issues, however, given Campfield's failure to identify any specific claims affected by Safelite's alleged misrepresentations.

19

can be intelligently met' "].)  The standard is not onerous; we do not mean to suggest that Campfield must identify every fraudulent claim at the pleadings stage, as did the plaintiffs in *Discovery Radiology*.  (*Discovery Radiology,* at p. 549.)  But he does need to identify one or more examples of specific fraudulent claims so that Safelite has concrete allegations to defend against, instead of having to guess about when the alleged fraud occurred and who the alleged victims were.  "[G]eneral and conclusory allegations" like those in Campfield's complaint "do not suffice." (*Id.* at p. 548.)

We would normally be willing to give Campfield leave to amend his complaint to identify, if he can, specific claims to insurers affected by Safelite's misrepresentations.  But Campfield conceded in the trial court that he could not amend the complaint to identify any such claims, and he does not attempt to retract that concession on appeal.  Instead, he suggests at various points that he cannot identify specific claims because the trial court prevented him from conducting third-party discovery from insurers, the putative victims of Safelite's fraud, while the demurrer was pending.  The only place in his opening brief that he actually argues with citations to authority that the trial court erred in staying discovery is in a footnote in his recitation of the background of the case.  While he discussed the issue under its own heading and in more detail in his reply brief, Campfield forfeited the argument by failing to raise it properly in his opening brief.  (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555, 559 [arguments are

20

forfeited when raised only in a footnote, not under a separate heading, or for the first time in reply brief].)

In any case, a lack of discovery cannot excuse Campfield's failure to plead his IFPA claim with sufficient detail.  The heightened pleading standard exists in part " ' "to deter the filing of complaints as a pretext for the discovery of unknown wrongs . . . and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." ' " (*State of California ex rel. McCann v. Bank of America, N.A.*, *supra*, 191 Cal.App.4th at p. 909.)  Similarly, as Safelite notes, qui tam actions like Campfield's under the IFPA "are meant to encourage private whistleblowers, uniquely armed with information about false claims, to come forward.  These insiders should have adequate knowledge of the fraudulent acts to comply with the [heightened] pleading requirement." (*McCann*, at p. 907.)  One aspect of the IFPA, the public disclosure bar, exists for just this reason, to ensure that relators bring actions based on their own knowledge, not information from certain public sources. (See *People ex rel. Allstate Ins. Co. v. Weitzman*, *supra*, 107 Cal.App.4th at p. 564 [the IFPA was intended to permit recovery only by those who "contributed or assisted in a material way in exposing the fraud"].)  The IFPA is not intended to provide a mechanism for those with general suspicions of wrongdoing like Campfield to engage in discovery seeking to confirm their suspicions.

## DISPOSITION

The judgment is affirmed.

BROWN, P. J.

WE CONCUR:

GOLDMAN, J.
SMILEY, J.*

*State of California, ex rel. Richard Campfield v. Safelite Group, Inc., et al.* (A168101)

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.