Filed 7/25/14 (unmodified opn. attached)/

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE STATE OF CALIFORNIA ex rel. MICHAEL WILSON et al., <br><br>     Petitioners, <br><br>     v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br>     Respondent; <br><br> BRISTOL-MYERS SQUIBB CO., <br><br>     Real Party in Interest. | B252073 <br><br> (Los Angeles County <br> Super. Ct. No. BC367873) <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that footnote 19 on page 17 of the opinion filed herein on June 27, 2014, be modified to read as follows:

Although the remedies provided by section 1871.7 are expressly nonexclusive, and section 1871.7 expressly provides for equitable remedies, the precise nature and extent of the equitable or other remedies that might or might not be available is not among the issues raised in this proceeding. This opinion's discussion of particular potential remedies should not be understood to preclude the adjudication of these issues when they are appropriately raised. We also express no opinion on the question whether violations of subdivision (a) might give rise to remedies under provisions such as the Unfair Competition Law, Business and Professions Code sections 17200 et seq.

There is no change in the judgment.

The petition for rehearing is denied.

_____

CHANEY, Acting P. J.          JOHNSON, J.          MILLER, J[*].

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/27/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE STATE OF CALIFORNIA ex rel. MICHAEL WILSON et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br> Respondent; <br><br> BRISTOL-MYERS SQUIBB CO., <br><br> Real Party in Interest. | B252073 <br><br> (Los Angeles County <br> Super. Ct. No. BC367873) |

Petition for extraordinary writ.  Kenneth Freeman, Judge.  Petition is granted.

Waters Kraus & Paul, Gary Paul, Michael L. Armitage, Michael B. Gurien, Paul Cook, Louisa O. Kirakosian, Charles S. Siegel for Petitioners.

Adam M. Cole, Richard G. Krenz, Antonio A. Celaya for Intervenor California Department of Insurance.

No appearance for Respondent.

Wilmer Cutler Pickering Hale and Dorr, David C. Marcus, John J. Butts, Christopher T. Casamassima, Matthew D. Benedetto; Hogan Lovells US, Mitchell J. Lazris, Nicholas G. Stavlas, Jessica L. Ellsworth for Real Party in Interest.

_____

This proceeding arises out of a *qui tam* action against Bristol-Myers Squibb Co. to impose civil penalties for violation of the Insurance Fraud Prevention Act (IFPA), Insurance Code section 1871 et seq. The relators allege Bristol-Myers employed runners and cappers to induce physicians to prescribe its drugs to their patients.

The California Insurance Commissioner and related petitioners seek a writ of mandate challenging a summary adjudication order in which the trial court concluded that proof of liability under Insurance Code section 1871.7 requires: (1) that a claim for payment be presented to an insurer; (2) that the claim must itself be fraudulent, containing express misstatements of fact; and (3) that the claim would not have been presented but for Bristol-Myers' unlawful conduct. Petitioners contend that the order unduly limits the application of section 1871.7.

We conclude that for the assessment of monetary penalties (but not the imposition of other available remedies), Insurance Code section 1871.7 requires proof of resulting claims that are in some manner deceitful, though not necessarily containing express misstatements of fact; and that causation may be established under the standard substantial-factor test, not the but-for test. Accordingly, we grant the writ and reverse the trial court's order.

**Background**

**The Underlying Action**

Michael Wilson, a former Bristol-Meyers Squibb Co. sales representative, on behalf of the People of the State of California, filed the underlying *qui tam* action[1] against Bristol-Meyers Squibb Co. (BMS) on March 16, 2007, and later amended it to add

---

[1] "'*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means "who pursues this action on our Lord the King's behalf as well as his own."'" (*San Francisco Unified School District ex rel. Manuel Contreras, et al. v. Laidlaw Transit, Inc.* (2010) 182 Cal.App.4th 438, 442, fn. 2; *Vermont Agency of Natural Resources v. United States ex rel. Stevens* (2000) 529 U.S. 765, 768, fn. 1.)

Lucius and Eve Allen, also former BMS sales representatives, as relators.[2]  (*State of California ex rel. Michael Wilson, Lucius Allen, and Eve Allen, Relators v. Bristol-Meyers Squibb Co.*, Los Angeles Superior Court case No. BC367873.)  The complaint was filed in the name of the State of California, under seal, as required by statute (Ins. Code, § 1871.7, subd. (e)), and was later unsealed by the court.  In March 2011, the California Insurance Commissioner (the Commissioner) intervened, and an amended complaint was filed on March 29, 2011.  The third amended complaint—the operative pleading—was filed in November 2011.[3]

The lawsuit alleges, in a factually detailed pleading, that in marketing its drugs, BMS engaged in a course of illegal and fraudulent conduct aimed at doctors, health care providers, pharmacists, and insurance companies.  It alleges BMS targeted high-prescribing physicians, members of formulary committees,[4] and sometimes their families, to be recipients of lavish gifts and other benefits (such as tickets to sporting events and concerts, free rounds of golf, resort vacations, meals, gifts, and other such incentives—characterized in the complaint as "kickbacks"), in order to induce physicians to prescribe BMS's drugs and to reward them for doing so.  The suit alleges BMS specifically

---

[2] A relator is a real party in interest in whose name a state or Attorney General brings a lawsuit.  He or she is generally the person who furnishes information on which the lawsuit is based.  (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538.)  The relators in this case are alleged to be former employees of BMS who have direct and personal knowledge of the alleged facts and are an original source of the those facts.

[3] BMS's demurrer to the second amended complaint was overruled.  In its order overruling the demurrer, the trial court (Carl West, Judge) struck from the pleading all references to Business and Professions Code section 650—the Anti-Kickback Act—and certified under Code of Civil Procedure section 166.1 that appellate resolution of certain issues would materially assist in the litigation's resolution.  BMS then petitioned for a writ of mandate challenging the demurrer ruling, which this court summarily denied on January 12, 2012.  The issues raised and the rulings made in that former proceeding are not at issue in this proceeding.

[4] A formulary committee makes decisions as to which drugs may be available for prescription to members of its organization.

3

targeted these benefits to physicians who had large numbers of patients enrolled in private health insurance plans, and instructed its sales representatives to hold the targeted physicians responsible for increased prescriptions—expressly characterizing this as "shaking the doctors down." And it alleges the targeted physicians "wrote prescriptions and submitted them to the private insurance companies . . . as a result of kickbacks BMS provided to them."[5] The suit alleges that in carrying out this program, BMS effectively employed physicians and others to act as runners and cappers, paying them for the purpose of procuring patients whose prescriptions will be covered by insurance. This conduct, the suit alleges, violated the IFPA, Insurance Code section 1871.7, subdivisions (a) and (b), as well as a number of provisions of the Penal Code. The complaint seeks monetary penalties, equitable relief, and "such other and further relief as [the court] deems proper."

BMS has not yet answered, but in its return to the petition it denies the complaint's material allegations. For example, BMS denies "any assertion that its sales representatives gave doctors items of value to try to influence prescription decisions;" that "either the promise to provide or the provision of an item of value to a doctor constitutes a 'kickback;'" or that "its sales representatives or the doctors they called on constitute 'runners, cappers, steerers or other persons'" to which the provisions of section 1871.7, subdivision (a), apply.

**The IFPA**

This petition concerns the proof required to establish a violation of subdivision (a) of Insurance Code section 1871.7, a portion of the IFPA that relates to health insurance and workers' compensation insurance fraud, informally entitled, "Employment of persons

---

[5] The third amended complaint includes allegations that BMS sought and obtained assurances that the doctors would increase their prescription-writing in exchange for the benefits BMS provided them, and BMS carefully tracked and documented the increases in the targeted doctors' prescriptions resulting from the "kickbacks."

to procure clients or patients.'"[6] Subdivision (a) makes it unlawful to knowingly employ runners or cappers to procure clients or patients to obtain insurance benefits.[7]

Subdivision (b) prescribes civil penalties and other remedies for violation of either subdivision (a) or Penal Code sections 549, 550, or 551, which target insurance and workers' compensation fraud.[8] The remaining subdivisions of section 1871.7 relate to the rights, duties, and procedures to be followed by governmental entities and other interested parties in the prosecution, settlement and dismissal of actions brought under subdivisions (a) and (b), and the allocation of fees and costs for the prosecution of such actions.

**The Summary Adjudication Motion**

The parties submitted below a stipulated motion for summary adjudication pursuant to subdivision (s) of Code of Civil Procedure section 437c, which permits

---

[6] Further references to "section 1871.7" are to section 1871.7 of the Insurance Code, and references to "subdivision (a)" and "subdivision (b)" are to subdivisions (a) and (b) of section 1871.7, unless otherwise specified.

[7] Subdivision (a) makes it unlawful to "knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits [under the workers' compensation law] or to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer."

[8] Subdivision (b) provides in pertinent part: "Every person who violates any provision of this section or section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation . . . pursuant to a contract of insurance. The court shall have the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public. The penalty prescribed in this paragraph shall be assessed for each fraudulent claim presented to an insurance company by a defendant and not for each violation."

Penal Code section 549 proscribes various forms of insurance fraud. Penal Code section 550 identifies numerous unlawful acts relating to presentation of insurance claims. Penal Code section 551 relates only to automobile insurance, and is not relevant to this case.

5

summary adjudication of legal issues that the parties stipulate and the trial court agrees will reduce the time to be consumed in trial or will significantly increase the likelihood of settlement. (See Code Civ. Proc., § 437c, subd. (s)(1)-(7); Stats. 2011, ch. 419, § 3.)[9] The motion submitted two legal questions based on hypothetical facts to which the parties stipulated for purpose of the motion.

Question 1 postulated three hypothetical facts:

i.      BMS provided or promised to provide an item or service of value to a physician;

ii.     one purpose of BMS providing or promising the item or service was to influence the physician to prescribe BMS drugs;

iii.    subsequent to BMS providing or promising the item or service, the physician prescribed a medically appropriate BMS drug.

Question 1 asked whether there can be a violation of section 1871.7, subdivision (a) or (b) under these hypothetical facts absent proof that the item or service caused the prescription.

Question 2 postulated two additional hypothetical facts:

iv.    express factual assertions on the claim submitted to the third party for payment of a health care benefit were not misstated;

v.     the claim for payment does not disclose the item or service provided or promised to the physician.

Question 2 asked whether subdivision (a) or (b) is violated under these facts.[10]

BMS argued that both questions should be answered, "no." As to Question 1, BMS contended that a violation of subdivisions (a) or (b) requires proof that *but for* the

---

[9] Subdivision (f)(1) of Code of Civil Procedure section 437c limits the availability of summary adjudication to circumstances where it "completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (See Code Civ. Proc., § 437c, subd. (f)(1); Stats. 2009, ch. 1561, § 2 (Sen. Bill 2594).) Subdivision (s) removes the limitation under certain circumstances.

[10] No party admitted the truth of these hypothetical facts.

6

provision of the benefit to a physician, the insurer would not have been presented with a claim for the BMS drug. As to Question 2, BMS contended that a claim to an insurer is not actionable under section 1871.7, subdivision (b), unless it is facially false or fraudulent—in other words, unless the claim is for services that were not provided or were not necessary.

**The Summary Adjudication Ruling**

The trial court (Kenneth Freeman, Judge) agreed with BMS. It looked to subdivision (b)'s final sentence, which states that "[t]he penalty prescribed in [subdivision (b)] shall be assessed for each *fraudulent* claim *presented* to an insurance company . . . and not for each violation." (Italics added.) The court held that under that language it is not enough to prove that the unlawful conduct was a substantial factor resulting in the prescription. The court held this language permits the assessment of penalties only if the prescription would not have been written but for the unlawful conduct; that the prescriptions must be shown on a prescription-by-prescription and claim-by-claim basis to have been a quid pro quo for value provided by BMS;[11] and that the resulting claim must be independently fraudulent and not merely unlawful, containing on its face an express misstatement of fact.[12]

Ruling on the summary adjudication motion, the trial court held that subdivision (b)'s penalties cannot be assessed under the facts postulated in the summary adjudication motion. Under these rulings, neither the conduct made unlawful by subdivision (a), nor even much of the conduct that is unlawful under Penal Code section 550, can constitute the fraud that is a prerequisite to the assessment of subdivision (b)'s penalties.

---

[11] As the trial court put it, "[i]f the reasons [for the prescription] amounted to a *quid pro quo* arrangement, then this may violate the statute. If, instead, the reason was attributed to a physician's independent medical judgment, regardless of whether an item of value was promised, then this would not violate the statute."

[12] As the trial court put it, "[i]f the express factual assertions on the claim were not misstated, then the claim would not be a 'fraudulent' one" under subdivision (b).

7

The trial court filed and served its ruling on September 23, 2013, stating as part of its order that pursuant to Code of Civil Procedure section 166.1, appellate resolution of the issues raised by the summary adjudication "may materially assist in the resolution of the litigation."

**The Petition For Writ Of Mandate**

On October 23, 2013, petitioners applied for a writ of mandate or other appropriate relief in this court, filing supporting exhibits and a request for judicial notice of certain documents. On November 13, we requested opposition to the petition, which we received on November 25, along with supporting exhibits. On December 23, 2013, we ordered the superior court to show cause why the October 9, 2013 order should not be set aside. BMS filed a return to the petition, with supporting exhibits, to which the petitioners replied, also with supporting exhibits, and with an additional request for judicial notice.

**Appealability and Standard of Review**

An order granting summary adjudication is appealable only after entry of final judgment. (Code Civ. Proc., § 904.1; *Fisherman's Wharf Bay Cruise Corp. v. Superior Court of San Francisco* (2003) 114 Cal.App.4th 309, 319.) However, mandate may be available to review such an order where the petition presents significant issues of first impression (*Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1056), or where an erroneous ruling creates a likelihood that, unless interim review of issues of law is granted, two trials will be necessary rather than one. (Code Civ. Proc., § 437c, subd. (m)(1); *Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 81.)

The writ petition in this proceeding was timely filed on October 23, 2003. The order granting summary adjudication had been entered September 23, 2013. On October 9, 2013, the trial court granted an extension of the statutory 20-day time within which to petition for an extraordinary writ, to October 24, 2013, as subdivision (m)(1) of Code of Civil Procedure section 437c gives it discretion to do.

The trial court's interpretation of section 1871.7 on undisputed facts raises pure issues of law. It therefore is subject to independent review. (*Pugliese v. Superior Court*

8

(2007) 146 Cal.App.4th 1444, 1448; *California Teachers Assn. v. Governing Bd. of Golden Valley Unified School Dist.* (2002) 98 Cal.App.4th 369, 375.) We view the evidence—the parties' stipulated hypothetical facts, and any reasonable inferences that may be drawn from them—"in the light most favorable to" the plaintiffs and petitioners. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

We granted writ review in part due to the dearth of appellate review of matters involving interpretation of section 1871.7, and because the parties and trial court urged that resolution of issues raised by the motion may in the long run ease the expense of the underlying litigation and its burden on the court.[13] In granting the alternative writ, we concluded this is an appropriate matter to be considered on a petition for writ of mandate. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, *supra*, 114 Cal.App.4th at pp. 319-320.)[14]

**Rulings on Requests for Judicial Notice**

Petitioners request judicial notice of the Senate Committee on Criminal Procedure Analysis of Senate Bill No. 465 (1995-1996 Reg. Sess.), relating to amendments to

---

[13] No published decision deals directly with the proof required to establish a violation or right to remedies under section 1871.7.

[14] The present version of subdivision (s) of Code of Civil Procedure section 437c was added by amendment, effective January 1, 2012. (Stats 2011, ch. 419, § 3 (Sen. Bill 384).) We are unaware of any appellate decisions that have yet addressed any aspect of this provision. Although the substantive issues raised by the subdivision (s) summary adjudication in this case are similar to those that trial courts routinely confront in demurrers, motions in limine, and evidentiary objections in complex litigation, subdivision (s) provides the advantages of procedural structure and trial court control that too often are lacking from those procedures. Nevertheless, this proceeding presents an example of the burdens and potential pitfalls attending subdivision (s) motions, in which the generality and paucity of the questions presented for adjudication and hypothetical facts—without benefit of discovery, evidence, or offers of proof—make it unlikely to result in the hoped-for economies of time and resources. We doubt that the Legislature intended this summary adjudication procedure to serve as a mechanism for obtaining advisory rulings and appellate review on hypothetical issues—a result to which this proceeding comes very close.

9

section 1871.7.  Respondent contends the document is irrelevant but interposes no objection to judicial notice.  We grant the request.

Petitioners request judicial notice of an excerpt from the Legislative Counsel's Digest relating to Assembly Bill No. 1050 (1999-2000 Reg. Sess.).  We have received no opposition to the request, which we grant.

Petitioners also request judicial notice of a Notice of Intervention filed by the Commissioner in another matter, as well as pleadings and settlement documents from other cases, apparently in order to counter contentions that their interpretations of section 1871.7 are unprecedented.  These requests we deny as irrelevant under the de novo standard of review that applies here.

## Discussion

### A.      Summary Adjudication Questions 1 and 2.

The parties and the trial court agreed to summary adjudication of questions "whether subdivision (a) or (b) is violated" under the postulated facts.  The answers to those literal questions are straightforward.  But the trial court's ruling on them is somewhat less so.

Subdivision (a) makes unlawful certain conduct done with the intention to induce the presentation of claims to insurers.  Subdivision (b)'s first sentence provides for the imposition of equitable and other remedies, and the assessment of civil monetary penalties, for "[e]very person who violates any provision" of subdivision (a) or specified penal provisions (most notably Pen. Code, § 550).

The conduct made unlawful by subdivision (a) is identified by a single verb:  To employ.[15]  Subdivision (a)'s single verb makes a single act unlawful:  Employment.

---

[15] In subdivision (a), the phrase "to procure" is not used as a verb, but as an adverbial, or adverbial phrase—a word or group of words functioning as an adverb. (Webster's College Dict. (1995) p. 20; Fowler, Aaron, The Little Brown Handbook (5th ed. 1992) p. 190 [infinitive phrase serving as adverb].)  The phrase "to procure" modifies "to employ" by describing the purpose of  the proscribed employment—the employment of someone to procure something.  The phrase "to perform or obtain" modifies the prior

What kind of employment is unlawful? Employment of a person or persons ("runners, cappers, steerers or other persons"), for a specified purpose: ". . . to procure clients or patients to perform or obtain services or benefits . . . that will be the basis for" an insurance claim. Subdivision (a) is violated by the employment of others with that objective; it does not make proof of that result a prerequisite to its violation.

Question 1 postulates that BMS provided or promised to provide an item or service of value to a physician in order to induce the prescription of BMS drugs, and that the physician thereafter prescribed BMS drugs. It thereby assumes an employment for the purpose that Subdivision (a) defines as unlawful.[16] The literal answer to Question 1 therefore must be "yes"—there can be a violation of subdivision (a) without proof that the item or service of value provided or promised to the physician caused a particular prescription to be written.

Question 2 asks whether subdivision (a) or (b) is violated if two additional facts are postulated: (1) that the claim for payment has on its face no express misstatement of fact; and (2) that the claim for payment does not disclose that the prescription-writing physician received the unlawful inducement. Neither of Question 2's added facts could negate a violation that rests on the facts postulated in Question 1. Certain conduct is defined as unlawful by subdivision (a) and by Penal Code section 550, without regard to any result the conduct may or may not cause. If BMS violated subdivision (a) or Penal

---

adverbial phrase "to procure," by describing the proscribed objective of the procurement—the procurement of a third person to perform or obtain something. The phrase "will be" is not a verb, but is a portion of a noun clause functioning as an adjective, modifying "services or benefits."

[16] The facts postulated in Question 1 assume that a physician could be a "runner, capper, steerer or other person," as well as a "client," and that providing a benefit to a physician to influence prescriptions constitutes procuring a client or patient to perform or obtain services or benefits within the meaning of subdivision (a). BMS's Return to the Petition in this proceeding contends that, as a matter of law, a physician could never fill these roles under section 1871.7. However, the trial court previously overruled a demurrer that BMS had interposed on that theory, the issue was not among those on which BMS sought or obtained summary adjudication, and we do not address it here.

Code section 550 by employing others for the purpose that is defined as unlawful by subdivision (a), or by concealing material events or supporting a claim with false or misleading information (Pen. Code, § 550, subds. (b)(2), (b)(3)), such a violation would not be negated by the absence of an express misstatement of fact contained in a resulting claim. For this reason, the literal answer to Question 2 must also be "yes"—there can be a violation of subdivision (a) even if the claim contains no express misstatement of fact and does not disclose the unlawful conduct.

Questions 1 and 2 ask also whether there can be a violation of subdivision (b) under the postulated facts. But subdivision (b) does not itself make any conduct unlawful; it merely prescribes the remedies that may follow violations of subdivision (a) and the referenced Penal Code provisions.

However, the trial court's rulings involve not so much whether there can be a violation of these provisions under the postulated facts, but the proof that is required to justify the assessment of civil penalties under subdivision (b). We discuss these underlying issues below.

**B.    The Underlying Issues.**

Addressing the issues involved in the trial court's rulings, we conclude below that the trial court was correct in ruling that for the assessment of its monetary penalties, subdivision (b)'s final sentence requires proof of "fraudulent claim[s]" resulting from the defendant's unlawful conduct. However, the trial court erred in a number of respects with respect to the proof required to establish these elements.

Contrary to the trial court, we conclude:

(1) The "fraudulent claim" requirement refers broadly to claims that are in some manner deceitful, and is not limited to claims that contain an express misstatement of fact.

(2) Whether claims resulting from the conduct made unlawful by subdivision (a) and Penal Code section 550 are or are not "fraudulent" or deceitful within subdivision (b)'s meaning cannot be determined as a matter of law upon the postulated facts; that proof may depend also on

12

factors such as the parties' relationship, course of conduct, and communications; the facts that are and are not communicated and the materiality of those facts; the manner in which the prescriptions and claims were or were not induced; and the impact that the inducements did or did not have on the prescriptions written.

(3) Subdivision (b)'s requirement of claims "presented to an insurance company" refers to claims that have in some manner resulted from the conduct proscribed by subdivisions (a) and (b). The requirement is a prerequisite to the assessment of subdivision (b)'s penalties, but not an element of the offense for which the penalties are assessed. It is not necessarily limited to claims written strictly as a quid pro quo for items of value received from BMS, nor to prescriptions that would not have been written and claims that would not have been presented in the absence of the proscribed conduct.

(4) The postulated fact that the prescriptions for which claims are presented are medically appropriate neither compels nor precludes determinations that the claims are in some manner deceitful, or that that the unlawful conduct was a substantial factor in causing them to be written.

**1. For the assessment of civil penalties subdivision (b) requires proof of claims that are in some manner deceitful.**

**(a) Legislative history of section 1871.7 and subdivision (b).**

Until 1999, subdivision (b)'s first sentence provided the direction for its application: "Every person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject" to its civil penalties, as well as to any other available penalties. The language of this provision remained unchanged when subdivision (b) was amended to add its final sentence in 1999, but that amendment affected its application. The added sentence provided for the first time that subdivision (b)'s penalties are to be assessed and measured by the number of fraudulent claims presented to an insurer, rather than for each instance in which subdivision (a) or the

13

incorporated Penal Code provisions have been violated. (Former Ins. Code, § 1871.7, amended Stats. 1999, ch. 885, § 2 (Assem. Bill No. 1050); see Amendments, Deering's Ann. Ins. Code (2009 ed.) foll. § 1871.7, p. 274.)[17]

The petitioners argue that the Legislature's purpose in adding subdivision (b)'s final sentence was to make the amount of the monetary penalties commensurate with the violators' success in increasing the volume of its insurance claims by unlawful means. By making the amount of the penalties proportionate to the number of claims rather than the number of unlawful attempts to induce claims, large and successful violators—those most successful in inducing prescriptions for their drugs—would be subject to greater penalties than small players in the market. No contrary purpose has been suggested, and BMS's counsel conceded during oral argument in this proceeding that the Legislature's apparent purpose in adding subdivision (b)'s final sentence was to maximize, rather than reduce, the penalties to be imposed.

The actual impact of the amended language, as interpreted by the trial court in this case, apparently will be the opposite of that intention. Section 1871.7 provides for a system of enforcement incentives in which *qui tam* plaintiffs—typically whistleblowers, as in the underlying proceeding—file the action, to be joined by the Commissioner. (Ins. Code, § 1871.7, subds. (d), (e), (f); Gov. Code, § 12652, subd. (c).) Such procedures (modeled on those of the False Claims Act, Gov. Code, § 12650 et seq.) enable and encourage the enforcement of regulatory provisions, such as section 1871.7, that would otherwise be beyond the resources of public entities to enforce. (*State ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220, 1231; see *State of California ex rel. Metz v. Farmers Group, Inc.* (2007) 156 Cal.App.4th 1063, 1071 [subdivision (b)

---

[17] The Legislative Counsel's Digest to Assembly Bill No. 1050, as amended in August 1999, recites that existing law (section 1871.7 before the proposed amendment) permitted actions "for civil penalties plus an assessment . . . against a person who knowingly employs runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . under a contract of insurance, or that will be the basis for a claim [for insurance]." Its only reference to the final sentence to be added states that "[t]his bill would provide that civil penalties are for each fraudulent claim presented to an insurance company" by a defendant under section 1871.7.

14

was "designed to encourage insurers to bring section 1871.7 actions"].)  Without these procedures to involve potential whistleblowers in the enforcement of regulatory provisions such as section 1871.7, the Commissioner would lack the evidence and the resources to discover violations and to prosecute action such as these.[18]

The likely impact of the final sentence of subdivision (b), as interpreted by the trial court, would be to render the imposition of penalties difficult or impossible, thereby removing from section 1871.7 much of the incentive for *qui tam* whistleblower participation.  Whistleblower participants (in the underlying case, former employees of BMS) typically provide key information concerning the violations on which *qui tam* actions are based.  But while the former employees of BMS can provide information about, for example, payments made by their employer to induce prescriptions of its drugs, information about the results of those payments—whether a particular claim resulted from a particular violation—is likely to be far less available.  This sort of problem of proof is seen in many regulatory arenas, ranging from insider trading to campaign finance.  Typically, proof is available to show that a particular stock transaction followed disclosure of particular information, or that favorable votes followed contributions or gifts; but proof of the causal relationship between such events is ordinarily a matter of inference rather than eyewitness testimony.  A requirement that causation must be established will often make subdivision (b)'s penalties unavailable even when violations of subdivision (a) or Penal Code section 550 may be clear.

We have discovered no indication that in adding the final sentence to subdivision (b) the Legislature intended—or even considered—its negative impact on the enforcement of the IFPA's regulatory scheme, by drastically narrowing the application of its penalties to those circumstances in which a fraudulent claim can be shown to have resulted from the unlawful conduct.  Nevertheless, while "courts will not give statutory

---

[18] "'The driving force behind the [*qui tam* concept used in False Claims Act cases] is the providing of incentives for *individual citizens* to come forward with information uniquely in their possession and to thus aid the Government in [ferreting] out fraud.'" (*State ex rel. Harris v. PricewaterhouseCoopers, LLP*, *supra*, 39 Cal.4th at p. 1231.)

language a literal meaning if doing so would result in absurd consequences" (*In re J. W.* (2002) 29 Cal.4th 200, 210), "'"Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history."'" (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 719, quoting *In re Jennings* (2004) 34 Cal.4th 254, 265.) When the language of a statute is clear and unambiguous, we must presume the Legislature meant what it said. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

Despite the Legislature's apparent intention to maximize the penalties for violators whose unlawful conduct resulted in large numbers of claims, we cannot ignore its addition of the final sentence to subdivision (b), nor the resulting change in the law. Legislative intent must be garnered from the revised language rather than the version it replaced. Subdivision (b)'s amendment to provide that its penalties shall be assessed not necessarily against "every person" who violates subdivision (a) or the referenced Penal Code sections, but only "for each fraudulent claim presented to an insurance company by a defendant and not for each violation," requires some proof of claims that are characterized by fraud and are causally related to the violations, as discussed below.

### (b) Subdivision (b)'s requirement that its civil penalties are assessed based on proof of fraudulent claims does not apply to equitable or other remedies.

Subdivision (a) and Penal Code section 550 make specified conduct unlawful. Apart from that, they contain no requirement that the unlawful conduct must have resulted in actual prescriptions and claims to insurers, nor any requirement that any claim must be independently fraudulent. Under subdivision (b), "every person" who is guilty of the unlawful conduct shall be subject to the specified civil penalties, to any other penalties "that may be prescribed by law," and to "other equitable relief." Subdivision (f)(5) of section 1871.7 provides that these remedies are nonexclusive. Subdivision (g) of section 1871.7 provides for the reimbursement of costs and attorney fees in certain instances.

16

The final sentence of subdivision (b) limits the assessment of its penalties to something less than "every person" who is guilty of the unlawful conduct, however. Under it, the "penalty prescribed in this paragraph" may be assessed only "for each fraudulent claim presented to an insurance company," and not for each act that violates subdivision (a) or the incorporated penal provisions. The "penalty prescribed in this paragraph" is the "civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000)," and the "assessment of not more than three times the amount of each claim for compensation . . . ." But it does not encompass the "other equitable relief" that is authorized by subdivision (b), including injunction, disgorgement, costs, and attorneys fees, nor the "other penalties that may be prescribed by law." Those additional remedies (which are outlined but not specifically defined) are not within the meaning of the "penalty prescribed by this paragraph."[19]

The petitioners contend, with some justification, that this interpretation of subdivision (b), requiring proof of resulting fraudulent claims for the assessment of its penalties, will effectively condone and immunize conduct that the Legislature plainly intended to proscribe. Proof that a claim for payment of a prescription resulted directly from bribery and fraud used to induce the prescription, they contend, is an almost impossible burden, rendering subdivision (b) toothless to civilly prosecute or regulate drug companies' use of prohibited means to procure prescriptions and profits. And they contend that the error of this interpretation is shown by the fact that it renders subdivision (a) superfluous, because under Penal Code section 550 proof of a fraudulent claim would alone be sufficient to justify assessment of subdivision (b)'s penalties. Under the trial court's interpretation, they argue, subdivision (a) is rendered unnecessary surplusage; there would never be any reason to go to the trouble of establishing its violation by running or capping, because subdivision (b)'s penalties would be available even without

---

[19] We express no opinion on the question whether violations of subdivision (a) might give rise to remedies under provisions such as the Unfair Competition Law, Business and Professions Code sections 17200 et seq.

17

it. That result, they contend, violates the mandate that statutes must be interpreted to "give effect to all" of the statutory language. (Code Civ. Proc., § 1858.)

But the requirement that fraudulent claims resulted from the unlawful conduct does not render subdivision (a) wholly superfluous, although it does limit the application of subdivision (b) to far less than the petitioners urge. Subdivision (b) leaves the court with equitable and other remedies (such as injunction and disgorgement) to address violations that cannot be causally connected with fraudulent claims. Subdivision (a) remains a viable identification of running or capping activity as conduct that the Legislature has found to be unlawful, and to be "almost always" a harbinger of fraud. (Analysis of Sen. Comm. on Crim. Proc., Sen. Bill 465 (1995-1996 Reg. Sess.) p. 5.)

In adding the final sentence to subdivision (b), the Legislature could (and presumably did) conclude that the employment of runners and cappers that does not result in claims, or that results only in nonfraudulent claims, may appropriately be remedied by equitable devices, but that when the result is the presentation of fraudulent claims, the additional consequence of subdivision (b)'s monetary penalties is justified. This is consistent with the clear words of the statute, and """"we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history."""" (*Ennabe v. Manosa*, *supra*, 58 Cal.4th at p. 719.) If the resulting remedies are less vigorous than the Legislature intended, it is there that correction must be sought.

Under the clear language of subdivision (b), the equitable and other remedies that do not constitute the "penalty prescribed in this paragraph" may be imposed without proof that a prescription or claim resulted from the unlawful conduct, or that any resulting claim was fraudulent or deceitful.

### (c) The assessment of civil penalties under subdivision (b) requires proof of resulting claims that involve deceit.

Relying on subdivision (b)'s requirement that penalties must be assessed on the basis of fraudulent claims to insurers, the trial court ruled that subdivision (b) cannot be violated unless claims presented for payment are themselves independently fraudulent,

18

and that the fraud must consist of an express misstatement of fact contained in the claim. It reasoned that "[i]f the express factual assertions on the claim were not misstated, then the claim would not be a 'fraudulent' one subjecting the presenter of the claim to liability" under subdivision (b).

The statute does not justify the prerequisites that this ruling imposes on the assessment of penalties under subdivision (b). Under the trial court's interpretation, the requisite fraud cannot be established by proof of the sort that would ordinarily be sufficient to prove deceit, such as the intentional concealment or nondisclosure of material facts; it cannot be established by proof of communications or a course conduct apart from the contents of the particular claim; and it cannot be inferred from the commission of acts that are unlawful under subdivision (a) or the incorporated Penal Code provisions. It can be established only by proof of an express factual assertion on the face of the claim. We disagree.

Subdivision (b) provides that "every person who violates any provision" of subdivision (a) or of Penal Code section 550 "shall be subject" to its civil penalties, which are to be assessed on the basis of the fraudulent claims presented to insurers. Neither subdivision (a) nor Penal Code section 550 expressly identify fraud as an independent requirement. Subdivision (a) is violated by the employment of runners or cappers to induce claims that will be subject to insurance. Penal Code section 550 may be violated not only by the knowing submission of claims that are "false or fraudulent" (Pen. Code, § 550, subd. (a)), but also by the knowing concealment or failure to disclose material information, and by knowingly making "false or misleading" statements in connection with insurance claims. (Pen. Code, § 550, subds. (a)(9), (b)(1)-(b)(3).)

California law uses the words fraud and deceit interchangeably. (*Gonsalves v. Hodgson* (1951) 38 Cal.2d 91, 100-101; *Sixta v. Ochsner* (1960) 187 Cal.App.2d 485, 490; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 767, p. 1117.) A claim is "fraudulent" if it is characterized by deceit, dishonesty, or trickery, perpetrated to gain some unfair or dishonest advantage. (Webster's College Dict., *supra*, at p. 529.) This broad definition comports with the admonition of subdivision (c) of section 1871.7 that

19

subdivision (b)'s remedies are to be adjusted to conform to other available remedies in light of the statute's remedial purpose.[20] It is consistent also with subdivision (b)'s incorporation of the violations in Penal Code section 550, which encompass deceits shown by "false or fraudulent" claims (Pen. Code, § 550, subd. (a)), and statements that are "false or misleading." (Pen. Code, § 550, subds. (a)(9), (b)(1)-(b)(3).)

The words "fraudulent claim" in subdivision (b) do not justify the trial court's narrow interpretation, which limits actionable claims to those that contain express misstatements of fact. In construing a statute, the objective sought to be achieved and the evil sought to be prevented by the statute are of prime consideration. Where words of common usage have more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning is thereby enlarged or restricted; and this is especially true where necessary to avoid absurdity. (*People ex rel. San Francisco Bay Conservation & Development Com. v. Town of Emeryville* (1968) 69 Cal.2d 533, 543-544.) Far from justifying this narrow interpretation of subdivision (b)'s reference to fraudulent claims, the provision's context suggests that the term must be interpreted broadly, to encompass not just claims that can be shown to themselves contain fraudulent statements, but also those characterized in any way by deceit.

A substantial purpose for subdivisions (a) and (b)'s enactment is to enable the assessment of civil penalties for unlawful running and capping activities, without the practically impossible showing that a particular claim resulted from a particular violation. Such a showing, if it were possible, would likely be sufficient to establish not just violations of subdivision (a) and Penal Code section 550, but also bribery or illegal kickbacks in violation of Business and Professions Code section 650 (and undoubtedly other provisions of law). While section 1871.7 nowhere defines the conduct identified in subdivision (a) as necessarily fraudulent or deceitful, neither is there any indication that

---

[20] "If the court finds, after considering the goals of disgorging unlawful profit, restitution, compensating the state for the costs of investigation and prosecution, and alleviating the social costs of increased insurance rates due to fraud, that such a penalty would be punitive and would preclude, or be precluded by, a criminal prosecution, the court shall reduce that penalty appropriately." (§ 1871.7, subd. (c).)

20

such conduct is categorically free of fraud when it is characterized by deceit, dishonesty, or trickery, perpetrated to gain some unfair or dishonest advantage. (Webster's College Dict., *supra*, at p. 529.) The Legislature has found that conduct to be unlawful, and "almost always" to be identified with fraud. (Analysis of Sen. Com. on Crim. Proc., Sen. Bill No. 465 (1995-1996 Reg. Sess.) p. 5.) The Legislature is unquestionably justified in seeking to curb that conduct, not because it is itself necessarily fraudulent or deceitful (though it often may be), but because of the difficulties of proving the fraudulent nature of either the conduct or its consequences.

Subdivision (a) identifies certain running and capping activities as unlawful without regard to whether the resulting services are competently rendered. Running and capping activities are disfavored and unlawful not just because they may often result in services that are excessive or unnecessary, but also because their purpose is to unfairly (and perhaps deceptively) obtain the benefits (clients, patients, prescriptions, claims, etc.) that otherwise might have gone to others who did not use the prohibited methods. In enacting section 1871.7, the Legislature could have concluded that using runners and cappers for the prohibited purpose tends to result in additional insurance claims and payments, that have substantial social costs despite their inability to be identified on an individual basis. Subdivision (b) identifies remedies for conduct that the Legislature has concluded leads to undesirable results that are rarely subject to available proof.

Upon proof of a cause of action for deceit, the plaintiffs would be entitled to the damages resulting from the defendant's wrongful conduct. But subdivision (b) is not a substitute for a civil tort action for deceit. It provides civil penalties for conduct that is made unlawful by other provisions of law; the plaintiffs in an action for its penalties are not direct victims, they did not rely on any misstatements or nondisclosures, and they suffered no resulting harm—apart from that suffered by insurance policyholders and society as a whole.

Yet even fraud that would be sufficient to give rise to a tort action for deceit would not necessarily satisfy the trial court's requirement of proof that the resulting claim contained an affirmative misstatement of fact. Proof of fraud—even a cause of action for

21

damages for deceit—does not depend on proof of affirmative misstatements of fact, nor on their location in particular documents or claims.[21] "Actual fraud" may be conduct that does not constitute an express misstatement of fact, and that is not embodied in any particular document—including, for example, concealment or suppression of a material fact, as well as "[a]ny other act fitted to deceive." (Civ. Code, § 1572, subds. (3), (5).) An action for fraud or deceit will lie, for example, for the "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." (Civ. Code, § 1710, subd. (3); see Civ. Code, § 1572, subd. (3).)

This context gives ample reason to interpret subdivision (b)'s requirement of fraudulent claims broadly, to encompass claims that result from deceit or conduct that is done with an intention to gain unfair or dishonest advantage. (Webster's College Dict., *supra*, p. 529.) There is no reason to conclude as a matter of law that the Legislature intended the term "fraudulent" in subdivision (b) to have a narrower meaning.

California law recognizes many circumstances in which the proof required to show fraud requires far less than would be required to establish a civil cause of action for fraud. (E.g., *Hughes v. Bd. of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692-693 [fraud or deceit sufficient to justify revocation of professional license, shown by misrepresentations on resume and license application, without proof of any defect in quality of resulting services or reliance by any client]; *Murrill v. State Board of Accountancy, etc.* (1950) 97 Cal.App.2d 709, 713-714 [Accountant's intentional failure to file income tax returns found to be conduct characterized as fraud or deceit].) In the underlying case certain conduct is alleged to have been done in order to induce additional prescriptions and claims to insurers for BMS's drugs, using methods that subdivision (a) and Penal Code section 550 identify as unlawful. We are unable to discern in these

---

[21] The requirements for a tort action for deceit are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. (5 Witkin, *supra*, Torts, § 772, p. 1121.)

22

provisions a legislative intent that subdivision (b)'s penalties can be available only upon proof that a claim resulting from the unlawful conduct would also independently support a cause of action for fraud, that the unlawful conduct cannot be used to show the requisite fraud, or that the fraud must consist of affirmative misstatements of fact contained in claims presented to insurers.

The "fraudulent claim" requirement does not limit the availability of the equitable and other remedies available under subdivision (b); but it does limit the imposition of subdivision (b)'s civil penalties to proof of claims that have a causal relationship to the unlawful conduct, and that are in some manner deceitful.

2. **The conduct made unlawful by section 1871.7 may—but does not necessarily—constitute fraudulent conduct within the meaning of subdivision (b).**

The parties have postulated for the purpose of their summary adjudication motion that items or services of value have been provided in order to induce prescriptions of BMS drugs, that BMS drugs were thereafter prescribed, and that the claims for payment did not disclose those facts. But beyond that sparse outline, the actual facts remain unknown at this stage of the trial court proceedings. Contrary to the parties' urging, we conclude that the postulated facts do not provide a sufficient factual basis on which to conclude that BMS's conduct either does, or does not, constitute the fraud that is required for the assessment of penalties under subdivision (b).

Contrary to the petitioners' urging, we are unable to find anything in the statutory language or history of section 1871.7 that defines the nature of the fraud that is required for the assessment of penalties, or that equates subdivision (a)'s unlawful conduct with fraudulent claims. By the same token, however, we discern no basis on which to conclude that the conduct that is unlawful under subdivision (a) could not, upon a sufficient factual showing, be found to be fraudulent within the meaning of subdivision (b). The Legislature could have defined subdivision (a)'s unlawful conduct as constituting fraud, or it could have provided that penalties shall be assessed for claims arising from the unlawful conduct; but it did neither. It could also have specified that

23

fraud must be established by some particular proof, but that, too, it did not do.  As in most cases, the existence of fraud remains an issue of fact.

Subdivision (b) says nothing at all concerning the countless forms that fraud and deceit may take, nor to limit the evidence by which it might be proved.  Various possible factual circumstances might strengthen, weaken, or wholly negate any inference of deceit that could arise from the drug company's conduct.  These factors might include the magnitude of the unlawful conduct, whether the BMS drug is medically preferred, and whether the nature and extent of the drug companies' incentives have been disclosed, for example.

The postulated facts are not sufficient to demonstrate either the existence or nonexistence of fraud in the transaction.  We therefore conclude that the showing of fraud that is required for the assessment of penalties is neither established as a matter of law by subdivision (a)'s unlawful conduct, nor can the existence of that unlawful conduct necessarily preclude a factual determination that it constitutes or evidences fraud.

**3. The assessment of civil penalties under subdivision (b) requires proof of claims resulting from unlawful conduct, but not necessarily proof that without the unlawful conduct the claim would not have been presented.**

The trial court interpreted subdivision (b) to require proof of causation as a predicate to assessment of subdivision (b)'s penalties, relying on the provision in subdivision (b)'s final sentence, that its penalties may be assessed only "for each fraudulent claim presented" to an insurer.  Although petitioners dispute that subdivision (b) requires proof that specific claims resulted from specific violations, they nevertheless correctly concede, at least implicitly, that there must be some manner of causal relationship between the unlawful conduct and its results.  The penalties cannot be imposed merely because claims for prescriptions of BMS drugs have been presented sometime after BMS engaged in the proscribed conduct.

We agree that to justify subdivision (b)'s penalties, there must be a causal relationship between the prohibited conduct and the prescriptions; the unlawful conduct

24

must be shown to have been a substantial factor resulting in the claims for BMS prescriptions. And while an inference of causation may often arise when one event follows another, that temporal relationship may not alone be sufficient.

Just as factors such as the magnitude and temporal proximity of the unlawful conduct might evidence or negate the existence of fraud, so too might many of the same factors influence the extent to which an inference of causation is appropriate. Any number of possible circumstances might severely weaken or negate the inference of a causal relationship—such as whether the BMS drug is a medically preferred prescription; whether it was supplied although the prescription was for another company's drug (e.g., a substitution by pharmacy, or resulting from an insurance company preference); whether the magnitude of the unlawful conduct justifies an inference that it had a substantial influence on the drug's selection; and whether the passage of time since the unlawful conduct has been so great as to dissipate any such inference.

Notwithstanding the petitioners' apparent understanding that a causal relationship must exist between the unlawful conduct and its results, they dispute the trial court's ruling that causation must be shown on a but-for basis, however. They argue the requisite causation may be proof that BMS's unlawful conduct was a substantial factor leading to the claims. This might be established, for example, by showing that the unlawful conduct strongly influenced the physician (or his or her decisionmaker) in determining what medication to prescribe. BMS argues that petitioners must prove more, however: they must prove not just that BMS's unlawful conduct strongly influenced the result, but that without the unlawful conduct, the physician would not have written the prescriptions and the claims for payment would not have been presented.

The trial court agreed with BMS, concluding that the proof must in all cases show not only that unlawful conduct was a substantial factor influencing physicians to write prescriptions, but also that without that conduct the prescriptions would not have been written. The court reasoned that such proof is required by the final sentence of subdivision (b), and the decision in *Viner v. Sweet* (2003) 30 Cal.4th 1232. We conclude

25

this requirement fails to take into account the possibility of concurrent independent causes for the physician's conduct.

In *Viner v. Sweet*, a suit for damages for legal malpractice, the Supreme Court reaffirmed its holding in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968, that "'California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations.'" (*Viner v. Sweet*, *supra*, 30 Cal.4th at p. 1239.) Under the test set forth in Restatement Second of Torts section 432, the substantial factor test subsumes the "but-for" test of causation, "[e]xcept as stated in Subsection (2)" of that section. The exception stated in Subsection (2) provides that the "but-for" test does not apply "if 'two forces are actively operating . . . and each of itself is sufficient to bring about harm to another'"; in such circumstances, the actor's conduct "'may be found to be a substantial factor'" in bringing about the result, without proof that the result would not have occurred but for the actor's conduct. (*Viner v. Sweet*, *supra*, 30 Cal.4th at p. 1240.) The court thus recognized that when multiple forces operate independently, each of which is sufficient by itself to bring about the harm, a force that is a substantial factor in bringing about the harm may be found to have caused the harm. The Supreme Court recently reaffirmed this rule in *In re Ethan C.* (2012) 54 Cal.4th 610, holding that the "but for" limitation on proof of causation does not apply if the wrongful conduct would alone have produced the harm even without the contribution by other forces. (*Id.* at p. 640; see Rest.2d Torts, § 432.)

The *Viner v. Sweet*, *supra*, decision therefore does not support the trial court's ruling that causation necessarily must be established on a but-for basis. (See *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976-977 [to show that plaintiff's damages resulted from defendant's misrepresentation, "'[i]t is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.'" (Rest.2d Torts, § 546, com. b, p. 103.)].) This reasoning is reflected also in *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 326, in which the

26

Supreme Court reiterated the *Engalla* decision's analysis of the causation requirement. (*Engalla v. Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at pp. 976–977). Although proof of causation often requires proof that the plaintiff would not have acted as he or she did in the absence of the fraud, under the fraud prong of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.). "'"It is not . . . necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." [Citation.]'" (*In re Tobacco II Cases*, *supra*, 46 Cal.4th at p. 326.)

Here, the stipulated facts expressly assume a physician prescribes a medically appropriate drug. Given a choice among two or more medically appropriate drugs, the reasons why a physician would prescribe one over another could include many possible factors, including not just the physician's independent medical judgment as to the particular prescription, but also, for example, patient requests and preferences, direct advertising, relative costs of alternative treatments and drugs, dictates of institutional formularies, availability of particular drugs, insurance company preferences, and—of course—the unlawful conduct in which BMS had engaged to induce such prescriptions.

These potential causes can be, and in some respects must be, independent. Benefits provided to a physician by a drug company (such as tickets for the physician's family to attend amusement parks, sporting events, or vacation spas) do not implicate the physician's medical knowledge or judgment in selecting which drugs to prescribe. Patient's preferences might or might not reasonably influence physicians' medical judgments. Institutional formularies might impose requirements that influence or override physicians' independent judgments, based on economy and other factors, which might themselves be influenced by unearned benefits received from a drug company. Logic does not dictate that these causes necessarily combine with or depend on one another. They might (and, as a matter of motivational diversity alone, probably do) militate toward conflicting results.

27

The trial court's reliance on *Viner v. Sweet*, *supra*, as the controlling authority on the causation issue assumes that BMS's conduct could operate as a causative factor only in combination with these forces, not independently or at odds with them. Based on that assumption, the trial court concluded that petitioners must establish not only that BMS's unlawful conduct was a substantial factor resulting in the prescriptions, but that it also was essential to the result; that if the prescription would have been written even without BMS's unlawful inducement, the unlawful conduct cannot be found to have caused the prescription and claim. In other words, it would be nearly impossible to establish the causation required by subdivision (b) if a physician's medically appropriate judgment would justify a prescription for the same BMS drug, notwithstanding that BMS had provided the physician with substantial benefits and items of value, given for the purpose of influencing his or her decision to prescribe the BMS drug.

While the plaintiffs are required to show a causal relationship between the unlawful conduct and the resulting claims, at this stage of the case—before the defendants have filed an answer, before discovery, and before the identification of the evidence—it would be premature to conclude that proof of causation necessarily requires proof that the prescriptions would not have been written in the absence of the unlawful conduct. We do not think the law necessarily requires so heavy a burden.

We also reject the trial court's decision that proof of causation must be on a prescription-by-prescription and claim-by-claim basis. The court held on the issue of causation that section 1871.7 is violated only if the physician's reasons for writing *a particular prescription* amounted to a quid pro quo arrangement; that there can be no violation "[i]f, instead, the reason was attributed to the physician's independent medical judgment, regardless of whether an item of value was promised . . . ." In this respect, too, the evidence concerning the impact of the unlawful conduct on physicians' prescriptions cannot be so narrowly limited at this stage of the case.

Causation may in many instances be inferred from evidence that does not itself constitute direct evidence of reliance on an individual basis. In *In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116, the court reviewed the requirement of the Consumers Legal

28

Remedies Act (Civ. Code, § 1750 et seq.) that permits a recovery only when a consumer suffers damage "as a result of" the defendant's unlawful conduct. The court concluded that the plaintiffs must show that a defendant's conduct was deceptive and that the deception caused them harm—but that proof of causation need not necessarily be on an individual basis. The plaintiff may be able to establish causation on a common basis, depending on the proof, """"showing causation as to each by showing materiality as to all."" [Citation]."") (*In re Vioxx Class Cases*, *supra*, 180 Cal.App.4th at p. 129; see *People v. Sisneros* (2009) 174 Cal.App.4th 142, 152 [evidence that witness knew of gang's propensity to retaliate against those who testify against its members supports inference that witness's refusal to testify resulted from fear of gang retribution]; *Smith v. Lockheed Propulsion Co.* (1967) 247 Cal.App.2d 774, 781 [evidence that well produced muddy water soon after rocket test supports inference of causal connection between rocket test and damage to well].) In the underlying case, such evidence might, for example, show that the individuals influencing or controlling the choice of drugs available for prescription in a particular hospital or other formulary had specified a preference for a BMS drug, to the exclusion of equally appropriate drugs of its competitors, only after being provided substantial unearned benefits by BMS. The prescription of BMS drugs under such a regimen might tend to show that the BMS prescriptions and claims resulted more from the benefits provided than from individual treatment decisions. (We do not suggest by this example that any such evidence exists or would necessarily be persuasive or controlling.)

Section 1871.7 contains no specification that proof of unlawful conduct, or of causation, must necessarily be on a prescription-by-prescription or claim-by-claim basis, and such a requirement would be contrary to the statute's clear purpose. While subdivision (b)'s final sentence requires proof of deceit and causation, section 1871.7's primary focus is on the unlawful conduct identified in subdivision (a); the proof of resulting claims is required in order to measure the penalties to be assessed, not to define the targeted wrong—the employment of runners and cappers for the unlawful purpose. Yet the requirement that each prescription and claim to an insurer must be attributed to a

29

quid pro quo arrangement involving the drug company and the physician shifts the focus from the conduct identified in subdivision (a)—which is unlawful without regard to its success in producing prescriptions and claims—to conduct that would constitute bribery and kickbacks, for which success is an essential element.

Courts regularly resolve factual issues, including issues of causation, using statistical and other expert conclusions drawn from group behavior. (See *In re Vioxx Class Cases*, *supra*, 180 Cal.App.4th at p. 129 [evidence may show causation of harm resulting from unlawful representations on group rather than individual basis].) For this reason we reject the trial court's conclusion that the requisite causation can be established only on an individual-prescription or individual-claim basis.

### 4. Whether a physician may be a runner or capper is a question of fact that is not raised by the summary adjudication motion.

BMS argues that both the underlying complaint and the petition before this court rest on the incorrect assumption that the conduct allegedly done by BMS constitutes the employment of runners or cappers within the meaning of subdivision (a). However, the question whether the alleged conduct can be construed to constitute running and capping in violation of subdivision (a) was the subject of an earlier demurrer, the trial court's denial of which BMS challenged by writ petition to this court, which was denied summarily. It was not raised in the summary adjudication motion that is before us in this proceeding. As to BMS's contention that physicians who write medically appropriate prescriptions are categorically unable to be runners or cappers within the meaning of subdivision (a), the matter is one of proof, not of law.

### Conclusion

The trial court erred by concluding: (1) that in no case can conduct be actionable under subdivision (b) without proof that a prescription was written and a fraudulent claim presented to an insurer as a result of the unlawful conduct; (2) that in order to justify assessment of monetary penalties under subdivision (b) the proof must necessarily establish that the prescription for which payment is claimed would not have been written and the claim for payment would not have been presented but for BMS's unlawful

30

conduct; and (3) that in order to justify assessment of monetary penalties under subdivision (b) the proof must necessarily establish that the claim contains on its face an affirmative misstatement of fact.

## Disposition

The petition for writ of mandate is granted. Respondent court is ordered to set aside its ruling on the motion for summary adjudication and to enter a modified ruling that comports with this opinion. Petitioners are to recover their costs in this proceeding.

TO BE PUBLISHED.


                                       CHANEY, Acting P. J.


We concur:



    JOHNSON, J.



    MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31